# IN THE SUPREME COURT OF TEXAS

════════════

No. 16-0120

════════════

STEVEN PAINTER; TONYA WRIGHT, INDIVIDUALLY AND AS REPRESENTATIVE OF
THE ESTATE OF EARL A. WRIGHT, III, DECEASED; VIRGINIA WEAVER,
INDIVIDUALLY AND AS NEXT FRIEND OF A.A.C., A MINOR; AND TABITHA R.
ROSELLO, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF
ALBERT CARILLO, DECEASED, PETITIONERS,

v.

AMERIMEX DRILLING I, LTD., RESPONDENT

════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE EIGHTH DISTRICT OF TEXAS
════════════════════════════════════════════════

**Argued December 6, 2017**

JUSTICE LEHRMANN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE JOHNSON, JUSTICE GUZMAN, JUSTICE BOYD, and JUSTICE DEVINE joined.

JUSTICE GREEN filed a dissenting opinion, in which JUSTICE BROWN joined.

JUSTICE BLACKLOCK did not participate in the decision.

This negligence case arises from a motor-vehicle accident that occurred while a drilling-company employee was driving three of his coworkers from a drilling site to employer-provided housing after a shift. We must determine if genuine issues of material fact exist as to whether the driver was acting as the company's employee and within the course and scope of his employment at the time of the accident, subjecting the company to vicarious liability for his alleged negligence.

Although it does not dispute the existence of the employer–employee relationship, the employer asserts that it lacked control over the employee's conduct at the time of the accident, foreclosing vicarious liability as a matter of law. The trial court granted summary judgment for the employer, and the court of appeals affirmed. We hold that the employer was not entitled to summary judgment on the vicarious-liability claim. We therefore reverse the court of appeals' judgment and remand the case to the trial court.

## I. Background

Sandridge Energy, Inc., hired Amerimex Drilling I, Ltd., to drill oil-and-gas wells on the Longfellow Ranch in Pecos County. Amerimex provided mobile bunkhouses for its crews and typically located those bunkhouses at the drilling site. However, Sandridge did not allow bunkhouses on the ranch, requiring them to be moved approximately 30 miles away to Fort Stockton. The Sandridge–Amerimex contract accounted for this circumstance by mandating a bonus payment to the crew's driller to drive the crew to the site.[1] Specifically, the contract provided that "[Amerimex] shall invoice [Sandridge] for and pay each Driller to receive [sic] $50/day to drive crew out to well location."[2] Amerimex did not require its crews to stay at the bunkhouse or ride with the driller, although it appears undisputed that they typically did both. Further, Amerimex placed no restrictions on what route they took between the bunkhouse and the drilling site or where they stopped along the way.

---

[1] The driller supervised the four- to five-man crew.

[2] The contract provided for two additional bonuses—which, again, Amerimex paid and Sandridge reimbursed—that all crew members, not just drillers, could earn. Specifically, the contract included a "Subsistance [sic] Bonus" of fifty dollars per day, which was essentially a per diem to cover expenses, and a "Bottom Hole" bonus of fifty dollars per day, which was available to all crew members who remained employed from the well's "spud date" through its completion.

The Amerimex crews assigned to the Longfellow Ranch project worked twelve-hour shifts on a seven-days-on, seven-days-off schedule. J.C. Burchett was the driller on one of those crews and was paid the daily bonus to drive his crew between the bunkhouse and the ranch in his own truck. Burchett and his crew members—Steven Painter, Earl Wright, and Albert Carillo[3]—all lived significantly farther from the ranch than Fort Stockton, so they generally stayed at the bunkhouse. However, on one or two occasions, Burchett drove with the crew to Big Spring (where Burchett and at least one other crew member lived) after their shift instead of back to the bunkhouse.

On February 28, 2007, Burchett was driving the crew from the ranch back to the bunkhouse after their shift ended.[4] He struck another vehicle driven by Sarah Pena, resulting in a rollover that killed Wright and Carillo and injured Painter and Burchett. Burchett sought and received workers' compensation benefits following a contested case hearing before the Texas Department of Insurance Workers' Compensation Division. Amerimex argued in that hearing that Burchett was acting in the course and scope of his employment at the time of the accident, and the Division ultimately found Burchett's injury compensable because he was paid to transport the crew between the ranch and the bunkhouse, furthering Amerimex's business interests.

Painter and the deceased crew members' representatives and beneficiaries (collectively, Painter)[5] did not seek workers' compensation benefits. However, Amerimex initiated proceedings

---

[3] As the court of appeals noted, Carillo's name is spelled inconsistently throughout the record as both Carillo and Carrillo. Like the court of appeals, we use the former spelling.

[4] At that time, Burchett's crew worked the 6:00 p.m. to 6:00 a.m. shift. On the date in question, they had worked six days in a row and were scheduled to work one additional shift before their week-long break.

[5] In addition to Painter, the plaintiffs are Tonya Wright, individually and as representative of the estate of Earl A. Wright, III; Virginia Weaver, individually and as next friend of Albert A. Carillo, a Minor; and Tabatha P. Rosello, individually and as representative of the estate of Albert Carillo.

3

at the Division to determine whether the injuries suffered by Painter, Wright, and Carillo were covered by its workers' compensation policy. A Division appeals panel concluded that Amerimex lacked standing to do so and that, in any event, the employees were not injured in the course and scope of their employment and thus did not sustain compensable injuries. *In re Tex. Mut. Ins. Co.*, 331 S.W.3d 70, 73 (Tex. App.—Eastland 2010, orig. proceeding). The workers'-compensation proceedings are not at issue here, nor are they determinative of the issues presented.

Painter filed suit against Burchett, Amerimex, and Sandridge, alleging Amerimex and Sandridge are vicariously liable for Burchett's negligence.[6] The trial court granted summary judgment for Sandridge, and that judgment was severed and appealed. The court of appeals affirmed, holding that Sandridge lacked either contractual or actual control over the transportation of workers to the drilling site and that Burchett was not Sandridge's employee or borrowed servant at the time of the accident. *Painter v. Sandridge Energy, Inc.*, 511 S.W.3d 713, 723–26 (Tex. App.—El Paso 2015, pet. denied). We denied Painter's petition for review.

Meanwhile, Amerimex filed its own summary-judgment motion, primarily arguing the plaintiffs' claims are barred by the Workers' Compensation Act's exclusive-remedy provision. *See* TEX. LAB. CODE § 408.001(a) ("Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer . . . for the death of or a work-related injury sustained by the employee."). After that motion was denied, Amerimex filed a second summary-judgment motion, this time arguing Painter's vicarious-liability claim fails because no evidence shows Amerimex controlled the details of Burchett's work at the time of the accident (or, alternatively, the evidence

---

[6] The plaintiffs also sued Pena, but their claims against her are not part of this appeal.

4

conclusively demonstrates the absence of such control). The trial court granted this motion, severed the claims against Amerimex into a separate cause, and rendered a final take-nothing judgment in Amerimex's favor. Painter appealed.

The court of appeals acknowledged the existence of a fact issue as to whether Burchett was in the course and scope of his employment for workers'-compensation purposes. 511 S.W.3d 700, 707 (Tex. App.—El Paso 2015). However, the court concluded that, for vicarious liability to attach, "Amerimex must undertake some control as with the route or the means of transport, which might correspondingly reflect on the risk of the accident itself." *Id.* at 712. The court held that no evidence showed "Amerimex had or exercised any control over the manner of transportation—the type of vehicle used, the qualifications of the driver, the number of passengers, or any other issues which might implicate the kind of control that justifies shifting the risk of loss from one party to another." *Id.* at 713. Accordingly, the court of appeals affirmed the trial court's summary judgment for Amerimex. We granted Painter's petition for review.

## II. Standard of Review

Amerimex filed a combined traditional and no-evidence summary-judgment motion. *See* TEX. R. CIV. P. 166a(c), (i). We review no-evidence motions under the same legal sufficiency standard as a directed verdict. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). Under this standard, the nonmovant has the burden to produce more than a scintilla of evidence to support each challenged element of its claims. *Id.* In a traditional motion, the movant has the burden to show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). A defendant is entitled to summary judgment if it conclusively negates at least one element of the plaintiff's claim. *Frost Nat'l Bank v. Fernandez,*

5

315 S.W.3d 494, 508 (Tex. 2010). In reviewing either type of summary-judgment motion, we view the evidence "in the light most favorable to the nonmovant, crediting evidence a reasonable jury could credit and disregarding contrary evidence and inferences unless a reasonable jury could not." *Merriman*, 407 S.W.3d at 248; *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

### III. Vicarious Liability

### A. General Framework

Under the common-law doctrine of respondeat superior, or vicarious liability, "liability for one person's fault may be imputed to another who is himself entirely without fault solely because of the relationship between them." *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 540 (Tex. 2002) (plurality op.) (citation omitted). The doctrine has been explained as "a deliberate allocation of risk" in line with "the general common law notion that one who is in a position to exercise some general control over the situation must exercise it or bear the loss." *Id.* (quoting Keeton et al., Prosser and Keeton on the Law of Torts § 69, at 499–501 (5th ed. 1984)) (emphasis removed). Respondeat superior thus constitutes an exception to the general rule that a person has no duty to control another's conduct. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007) (citing *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983)).

We have long recognized the employer–employee relationship as one implicating the doctrine's risk-shifting policies. In this context, an employer is vicariously liable for its employee's negligent acts if those acts are within the course and scope of his employment. *Id.* In other words, to prove an employer's vicarious liability for a worker's negligence, the plaintiff must show that, at the time of the negligent conduct, the worker (1) was an employee and (2) was acting

6

in the course and scope of his employment. *See id.*; *see also Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 311 (Tex. 2002) (noting that the issues on appeal of a summary judgment for the employer on a vicarious-liability claim included (1) whether a fact question existed on the worker's status as an employee and (2) if the worker was an employee, whether he was acting in the course and scope of his employment).

As to the first element, disputes often arise over whether the worker was an independent contractor rather than an employee. The distinction is significant because, as a general rule, an employer is insulated from liability for the tortious acts of its independent contractors. *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 796 (Tex. 2006) (declining to recognize a "personal character exception" to this general rule). To resolve such disputes, we examine "whether the employer has the right to control the progress, details, and methods of operations of the work." *Limestone Prods.*, 71 S.W.3d at 312; *see also Wolff*, 94 S.W.3d at 542 (noting that the absence of the right of control "commonly distinguishes between an employee and an independent contractor and negates vicarious liability for the actions of the latter").[7]

We have also elaborated on the course-and-scope element, explaining that vicarious liability arises only if the tortious act falls "within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired." *Mayes*, 236 S.W.3d at 757. Further, the act "must be of the same general nature as the conduct authorized or incidental to the conduct authorized. Accordingly, if an

---

[7] In *Limestone Products*, we outlined five factors pertinent to the control analysis: (1) the independent nature of the worker's business; (2) the worker's obligation to furnish necessary tools, supplies, and materials to perform the job; (3) the worker's right to control the progress of the work except about final results; (4) the time for which the worker is employed; and (5) the method of payment, whether by unit of time or by the job. 71 S.W.3d at 312.

employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation." *Id.* (citation and internal quotation marks omitted).

## B. Right to Control and Employment Status

The court of appeals observed inconsistency in the case law about how the right-to-control requirement fits into the vicarious-liability analysis, noting that some courts have addressed it as part of the course-and-scope evaluation, while others discuss control "almost as a separate element." 511 S.W.3d at 712 n.9 (citing cases). Though the court of appeals opined that the question amounts to "more of an academic than practical inquiry," *id.*, it appears to have analyzed control as a separate "element that [Painter was] required to prove," *id.* at 712. Neither proffered approach is entirely accurate.

As explained, the potential for vicarious liability is premised on the relationship between the wrongdoer (agent) and the third party (principal) to whom liability is imputed. *Wolff*, 94 S.W.3d at 542. The defining characteristic of that relationship is the principal's "right to control the agent's actions undertaken to further the principal's objectives." *FFP Operating Partners, LP v. Duenez*, 237 S.W.3d 680, 686 (Tex. 2007) (noting that the relationship between a dram shop and its patron does not include this characteristic and holding that the Dram Shop Act does not impose a form of vicarious liability for damages caused by intoxicated patrons). This characteristic is present in the employer–employee relationship, which is why the employer's overall right to control the details of the work is what principally distinguishes an employee from an independent contractor. *Limestone Prods.*, 71 S.W.3d at 312. Thus, a plaintiff must demonstrate such a right to control in order to satisfy the first element of a vicarious-liability claim against an employer for

its employee's negligence: that the wrongdoer was an employee at the time of the negligent conduct.  But when that relationship is undisputed, the employer essentially concedes the existence of the right to control that is necessary to give rise to the relationship.  As a general matter, this right to control extends to all the employee's acts within the course and scope of his employment, i.e., actions "within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired."  *Mayes*, 236 S.W.3d at 757.

Accordingly, we disagree with those courts of appeals that have tied the right-to-control analysis to the course-and-scope element of a vicarious-liability claim.[8]  That element hinges on an objective assessment of whether the employee was doing his job when he committed a tortious act.  *See id.*; *see also Laverie v. Wetherbe*, 517 S.W.3d 748, 753 (Tex. 2017) (noting that the traditional scope-of-employment analysis in respondeat-superior cases "concerns only whether the employee is discharging the duties generally assigned to her" (citations and internal quotation marks omitted)).  The employer's right to control the work, having already been determined in establishing the employer–employee relationship, is not part of this analysis.

---

[8] In *London v. Texas Power & Light Co.*, for example, the court of appeals confusingly equated control with course and scope.  620 S.W.2d 718, 720 (Tex. Civ. App.—Dallas 1981, no writ).  The court held:

> The test of a master's liability for the negligent acts of his servant is whether at the time and occasion in question, the master has the right and power to direct and control the servant in the performance of the causal act or omission at the very instance of its occurrence.  *Stated another way*, for an act to be within the course and scope of a servant's employment, it is necessary that it be done within the general authority of the master in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed.

*Id.* (emphasis added) (citation omitted).  We agree with the principle espoused in the second sentence, as it matches our own course-and-scope test reaffirmed in *Mayes*.  But we fail to see how it merely restates the first sentence's task-based control requirement, which, in any event, we now reject.

In this case, Amerimex does not dispute that it employed Burchett as a driller on the date of the accident. Further, Painter presented evidence that one of Burchett's job duties *as a driller* on the Sandridge project was to drive his crew to and from the drilling site,[9] and that he was paid a "bonus" for performing this task.[10] Nevertheless, Amerimex argues it cannot be vicariously liable for Burchett's negligence because it exercised no control over the details of his driving, such as prescribing a route or requiring a particular means of transportation. Amerimex thus contends that Burchett was an "employee" for vicarious-liability purposes while on duty at the drilling site, "but not while he was driving away after his shift had ended and was no longer subject to Amerimex'[s] control." In other words, even in the face of an employer's concession that it had a sufficient overall right to control the details of the wrongdoer's work to give rise to an employer–employee relationship, Amerimex would have us reevaluate the worker's employment status for vicarious-liability purposes by isolating the task the worker was performing at the moment of the accident and conducting an independent evaluation of the employer's control with respect to that particular task. This position is inconsistent with the framework we have described. Further, it results in an unworkable paradigm that "conceivably could result in an individual shifting between employee and independent contractor status countless times in a given work day." *Mid-Continent*

---

[9] Amerimex argues that, at most, Burchett's job duties included driving the crew *to* the site and do not extend to driving the crew home *from* the site. We address and reject that argument in our course-and-scope analysis.

[10] Glen Murphree, Amerimex's chief financial officer, testified that as a practical matter any crew member could provide the transportation and receive the driver bonus, although "normally" the driller did so. But the evidence of such flexibility is disputed. The Sandridge–Amerimex contract specifically identifies the driller as the recipient of the bonus. Further, Burchett testified it was his job to get his crew out to the drilling site and back to the bunkhouse, that without the driver bonus he would have sought another job, and that Amerimex did not require submission of a daily report as to who drove on any given day. Instead, as the driller who was responsible for driving the crew—and who carried out that responsibility—Burchett was paid the driver bonus as a matter of course.

10

*Cas. Co. v. Andregg Contracting, Inc.*, 391 S.W.3d 573, 578 (Tex. App.—Dallas 2012, pet. denied).

The analysis Amerimex proposes is more appropriate to evaluating an owner's (or general contractor's) supervisory liability for harm caused by the acts of an independent contractor. We have recognized the potential for such supervisory liability where "the employer retains some control over the manner in which the contractor performs the work that causes the damage." *Fifth Club, Inc.*, 196 S.W.3d at 791; *see also Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985) (holding that, where a general contractor retained "the power to direct the order in which the work was to be done and to forbid the work being done in a dangerous manner," it was required to exercise that supervisory control in a reasonable manner). We noted in *Redinger* that this assessment must be conducted "when the employer retains some control over the manner in which the independent contractor's work is performed, but does not retain the degree of control which would subject him to liability as a master." 689 S.W.2d at 418. It follows that, when the employer *does* retain the degree of overall control that would subject him to liability as a master, evaluating such control on a task-by-task basis is unnecessary and improper.

The dissent argues that the task-based control analysis the court of appeals utilized in affirming summary judgment for Sandridge should be applied here. In *Sandridge*, the court cited *Redinger* and examined whether Sandridge either had the right under its contract with Amerimex to control the details of worker transportation or actually dictated such control. 511 S.W.3d at 722–23. However, analyzing control on a task-by-task basis in evaluating Sandridge's supervisory liability as a general contractor, but not in evaluating Amerimex's vicarious liability for the conduct of an employee, is consistent both with *Redinger* and with the principles underlying

11

vicarious liability.[11] As discussed, control over an independent contractor's conduct for supervisory-liability purposes is necessarily task-specific, but that is simply not the case when the conduct at issue is that of an admitted employee.[12]

Relatedly, the dissent opines that we make "the insupportable inference that Amerimex's right to control Burchett's drilling activities while at the job site and on the clock extends to Burchett's driving activities on his own time and in his own vehicle." *Post* at ___. We make no such inference. Rather, as discussed above, we infer that Amerimex's right to control Burchett's conduct as an employee—specifically, as a driller—extends to his actions within the course and scope of his employment.

Finally, Amerimex and the dissent rely on *Eagle Trucking Co. v. Texas Bitulithic Co.*, 612 S.W.2d 503 (Tex. 1981), to support their argument that employee status requires a task-based control analysis. In that case, Texas Bitulithic, which operated hot mix plants, contracted with G & G Construction to haul sand to Texas Bitulithic's premises. *Id.* at 507. G & G did not own enough trucks to complete the job on its own and subcontracted with Billy Peden, an assistant manager for Texas Bitulithic who also operated a sand-hauling service using his own truck. *Id.* at 508. Peden employed a driver, Guin, who was driving Peden's truck and was involved in an

---

[11] The dissent ignores this distinction, citing cases that, like *Redinger*, involve the question of when a general contractor may "be liable for its independent contractor's acts." *E.g.*, *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002).

[12] *Wolff* presents a narrow example of circumstances in which a task-based control analysis is required despite the existence of an employer–employee relationship. In that case, we discussed when an employee of one employer can become the "borrowed employee" of another if subject to its direction and control. 94 S.W.3d at 542; *see also Marino v. Lenoir*, 526 S.W.3d 403, 406 (Tex. 2017) (holding that the defendant physician was not an employee of a governmental unit under the Tort Claims Act because the actual right to control the details of her work as a resident physician had been assigned to another entity); *Producers Chem. Co. v. McKay*, 366 S.W.2d 220, 225 (Tex. 1963) (addressing the question of whether "general employees of one employer have, in a given situation, become special or borrowed employees of another"). The borrowed-employee doctrine does not apply here.

accident. *Id.* We held that Texas Bitulithic and G & G were not vicariously liable for the damages caused by the accident, concluding that "Peden's exercise of control over his own truck was like that of G & G over their own trucks, and that both were independent contractors." *Id.*

*Eagle Trucking* addresses a unique factual situation and does not apply here. Peden contracted with G & G, not Texas Bitulithic, to perform the hauling job; thus, he was not both an employee and an independent contractor of the same entity. Moreover, while Peden happened to be a Texas Bitulithic employee, he operated an independent hauling business and had hauled "for several other businesses in the area." *Id.* The fact that Peden's employer was the ultimate customer for the hauling job at issue was pure happenstance. Under those narrow circumstances, we held that Texas Bitulithic's general authority over Peden as its employee would not extend to his actions in connection with his own business.

By contrast, in this case, Burchett was not "in the independent business of carrying passengers for hire," and there is evidence that "[t]ransporting himself and the other workers to and from the place of work was merely part of his job as a member of the drilling crew working for [Amerimex] under the particular circumstances of this case." *See Tex. Emp't Ins. Ass'n v. Inge*, 208 S.W.2d 867, 870 (Tex. 1948) (holding, for workers'-compensation purposes, that a drilling contractor's employee did not "step[] out of his role as an employee and bec[o]me an independent contractor" when driving other crew members to and from a remote drilling site).[13] To the extent

---

[13] As noted, this case is also distinguishable from *Eagle Trucking* because Amerimex argues that Burchett was both an employee and a direct independent contractor of the same entity. Contrary to the dissent's suggestion, however, we do not foreclose that the circumstances could give rise to such a dual relationship. *See post* at ___. For example, perhaps the outcome would be different if the Amerimex–Sandridge contract merely required Amerimex to hire drivers to provide transportation, and Amerimex offered the extra work to Burchett instead of an unrelated person or company. Instead, the contract expressly contemplated that Amerimex would assign the driving task to specific employees, its drillers, and there is evidence that this is exactly what happened.

13

transportation of the crew was part of Burchett's job as a driller, it falls within Amerimex's "general power of supervision, implicit in the contract of employment" regardless of how much (or how little) control Amerimex actually chose to exercise over this particular task. *Id.* at 871; *see also Wolff*, 94 S.W.3d at 540 (noting the common-law justification for vicarious liability that "one who is *in a position to exercise some general control* over the situation must exercise it or bear the loss" (emphasis added)). Clearly, Amerimex was in a position to exert control over Burchett's manner of driving the workers to and from the drilling site in his capacity as a driller; it simply chose not to do so.

For all these reasons, we reject Amerimex's position that no evidence showed, or alternatively that the evidence conclusively negated, that Burchett was acting as Amerimex's employee at the time of the accident. Accordingly, we turn to whether Burchett was acting within the course and scope of his employment.

## C. Course and Scope of Employment

Applying an objective assessment of Burchett's conduct at the time of the accident, we disagree with Amerimex that the evidence on the course-and-scope element entitles it to summary judgment. Again, Burchett presented evidence that one of his specific duties as a driller—and one for which he was paid additional money over his regular salary—was to provide the crew transportation to and from the drilling site. This benefited Amerimex by ensuring that the full crew showed up for each shift and was not left stranded on site at the end of the workday, and that the drillers were not hired away by other companies. This evidence supports Painter's allegation that Burchett was acting within the scope of his general authority in furtherance of Amerimex's

business and for the accomplishment of the object for which Burchett was hired. *Mayes*, 236 S.W.3d at 757.

Amerimex presents two principal arguments regarding the course-and-scope element. First, it argues that the so-called coming-and-going rule, under which an employee is generally not liable for the acts of its employees while traveling to and from work, applies here. *See Pilgrim v. Fortune Drilling Co.*, 653 F.2d 982, 987 (5th Cir. Unit A Aug. 1981) (applying Texas law). We have long recognized a version of this principle in the workers'-compensation context, holding that as "a general rule an injury received while using the public streets and highways in going to or returning from the place of employment is not compensable because not incurred in the course of employment." *Tex. Gen. Indem. Co. v. Bottom*, 365 S.W.2d 350, 353 (Tex. 1963); *see also* TEX. LAB. CODE § 401.011(12) (defining "[c]ourse and scope of employment" in Workers' Compensation Act to exclude, with limited exceptions, "transportation to and from the place of employment"). The courts of appeals, as a matter of course, have applied the rule in the vicarious-liability context, and we see no reason to disturb that extension. *E.g.*, *Mancil v. Stroud*, No. 11-13-00354-CV, 2016 WL 932949, at *3 (Tex. App.—Eastland March 10, 2016, no pet.); *Chevron USA, Inc. v. Lee*, 847 S.W.2d 354, 355 (Tex. App.—El Paso 1993, no writ).

The courts of appeals have also recognized an exception to this rule when an employee has undertaken "a special mission at the direction of his employer" or is otherwise performing "a service in furtherance of [his] employer's business with the express or implied approval of [his] employer." *E.g.*, *J&C Drilling Co. v. Salaiz*, 866 S.W.2d 632, 636 (Tex. App.—San Antonio 1993, no writ); *Gebert v. Clifton*, 553 S.W.2d 230, 232 (Tex. App.—Houston [14th Dist.] 1977, writ dism'd); *see also Limestone Prods.*, 71 S.W.3d at 311 (in which we noted that one of the

15

issues presented, although we did not reach it, was whether the wrongdoer "was acting in the course and scope of his employment because he was on a special mission"). The courts are not uniform as to the exact parameters of this exception, but we find helpful guidance in two cases.

The Fifth Circuit has framed the exception as requiring "some special benefit to the employer other than the mere making of the employee's services available to the employer at his place of business." *Pilgrim*, 653 F.2d at 987. And in *Chevron USA*, the El Paso Court of Appeals more specifically identified a "special mission" to exist when the employee "is traveling from his home or returning to it on a special errand either as part of his regular duties or at the specific order or request of his employer." 847 S.W.2d at 356.[14] Of course, applying this exception depends heavily on the facts and circumstances of the case.

In *Pilgrim*, on which both Amerimex and Painter rely, the Fifth Circuit rejected the exception's applicability to circumstances that are somewhat similar to those at hand, but are also distinguishable in important respects. In that case, an employee of Fortune Drilling Company, who worked on a rig over 100 miles from his home, was involved in a car accident while driving his truck home after a shift. 653 F.2d at 983. Fortune's employees were not on the payroll while traveling to and from the drilling site. *Id.* Further, Fortune did not provide its employees any temporary housing close to the rig or transportation to and from the site. *Id.* However, Fortune paid a $25 daily travel allowance to one member of each crew, who decided among themselves who would receive the allowance on any given day. *Id.* The court held that neither the long

_____

[14] Some courts of appeals summarily conclude that when "the employer does not require any particular route, the employee is not engaged in the furtherance of the employer's business." *E.g.*, *J&C Drilling Co.*, 866 S.W.2d at 636 (citing *Wilson v. H.E. Butt Grocery Co.*, 758 S.W.2d 904, 907 (Tex. App.—Corpus Christi 1988, no writ)). We fail to see how a prescribed route is related to the furtherance of the employer's business.

distance between the employees' homes and the remote work site nor the payment of a travel allowance to one crew member per day was sufficient to create a special mission for the employer's benefit that would remove the case from the ambit of the coming-and-going rule. *Id.* at 987–88 (citing *Salmon v. Hinojosa*, 538 S.W.2d 22, 24 (Tex. Civ. App.—San Antonio 1976, no writ) ("[A]n employee is not acting within the scope of his employment while going to and from work, even though he uses his employer's vehicle as the means of transportation.")).

We do not necessarily disagree with the Fifth Circuit's conclusion in *Pilgrim*, but we hold that the distinguishing facts in this case warrant a different result, at least at the summary-judgment stage. Amerimex did not merely provide a travel allowance to its employees. It was contractually required to pay a specific crew member—the driller—a bonus for carrying out a specific task— driving the crew between the bunkhouse and the drilling site. Although Amerimex did not require its crew members to ride with the driller or even to stay at the bunkhouse, some evidence indicates it was Burchett's "job" to drive those who did, and Burchett testified that without the bonus he would have been forced to look for another job. Burchett was not merely making his own services available to Amerimex in driving between the bunkhouse and the ranch; he was ensuring the services of the rest of the crew were available as well. And more importantly, there is evidence that he was doing so as part of his assigned job duties.[15]

Amerimex notes that, in transporting the crew, Burchett was not required to travel directly between the bunkhouse and the ranch. He could stop for a meal, run a personal errand, or even, as happened on one or two occasions, travel all the way back to Big Spring rather than the

---

[15] Such evidence distinguishes this case from the hypothetical scenario envisioned by the dissent in which Burchett "was traveling in his own vehicle, on his own time, from a restaurant where he ate lunch using the subsistence bonus funded by Sandridge and paid to him by Amerimex." *Post* at ___.

17

bunkhouse. We agree that, if Burchett had been engaged in any of these activities at the time of the accident, the course-and-scope analysis would be affected. As noted, an employer is not responsible for what occurs when an employee deviates from the performance of his duties for his own purposes. *Mayes*, 236 S.W.3d at 757. This is the case even if the deviation occurs with the employer's express or implied permission. *See id.* at 757–58 (holding that an employee was not within the scope of employment while using his employer's vehicle to run a personal errand, even though he was not restricted from using the truck for personal business). Here, the evidence reflects that Burchett was driving the crew from the drilling site directly back to the bunkhouse after a shift when the accident occurred. Nothing in the summary-judgment record indicates a deviation from the performance of his duties.

Amerimex's second course-and-scope argument focuses on the fact that the accident happened while Burchett was driving back to the bunkhouse after a shift, as opposed to driving to the drilling site to begin a shift. Amerimex notes that the Sandridge–Amerimex contract requires payment of a driver bonus "to drive crew out to well location," but says nothing about driving home. Amerimex thus appears to imply that, at most, Burchett was acting within the scope of his employment while driving to, but not from, the ranch. For both evidentiary and common-sense reasons, we disagree.

As an evidentiary matter, Burchett testified as follows:

> Q. [S]o it's your understanding you were paid basically $50 a day from Amerimex to take yourself and your crew to the drilling rig; is that correct?
>
> A. Yes, sir.
>
> Q. And then you – and take yourself and the crew from the drilling rig back to the bunk house?

A. Yes, sir.

. . . .

Q. [Y]ou understood, as an employee, transporting that crew to the job site was important and you were going to be paid for it?

A. Yes, sir.

Q. $50 every day?

A. Yes, sir.

Q. And . . . if you're driving them out there and it's 30 miles back to the bunk house, everybody knows you're taking them home, too, aren't they [sic]?

A. Yes, sir.

According to this testimony, Burchett understood that his job duties included both driving the crew to the site and providing transportation from the site.

Further, as Painter argues, the conclusion that Burchett could satisfy his job responsibilities and earn the driver bonus by driving the crew to the site and leaving them stranded at the end of a shift simply defies common sense. *Cf. id.* at 757 (noting that "the employee's acts must be of the same general nature as the conduct authorized *or incidental to the conduct authorized* to be within the scope of employment" (emphasis added)). The fact that Burchett was not required to drive straight back to the bunkhouse is not dispositive; the key is that he could not simply leave the crew at the site. Again, to the extent Burchett could have chosen to conduct a personal errand while carrying out that responsibility, the law already ensures that Amerimex would not be liable for his actions in doing so.

19

## D. Summary of Vicarious-Liability Holdings

In sum, we hold that proving an employer's vicarious liability for a worker's negligence involves a two-step process. The plaintiff must show that, at the time of the negligent conduct, the worker (1) was an employee and (2) was acting in the course and scope of his employment. The employment-status inquiry involved in step one depends on whether the employer has the overall right to control the progress, details, and methods of operations of the work, whether or not it chooses to exercise that right as to any particular task. Relatedly, as a general matter, we do not evaluate employee status on a task-by-task basis. By contrast, supervisory liability for damages caused by an independent contractor is premised on a right to control the specific task giving rise to the injury. If an employer has a sufficient right of control to give rise to the employer–employee relationship, step two of the analysis comes into play because that right extends to the employee's acts within the course and scope of his employment.

The course-and-scope inquiry under step two involves an objective analysis, hinging on whether the employee was performing the tasks generally assigned to him in furtherance of the employer's business. That is, the employee must be acting with the employer's authority and for the employer's benefit. We confirm that the coming-and-going rule, under which an employee is generally not acting within the scope of his employment when traveling to and from work, applies in the vicarious-liability context. However, we also recognize an exception when such travel involves the performance of regular or specifically assigned duties for the benefit of the employer. And when a specifically assigned duty includes driving other workers to the workplace, it necessarily also includes ensuring they are not left stranded at the end of the workday.

In this case, Amerimex does not dispute that it employed Burchett as a driller at the time of the incident, and we reject Amerimex's argument that, as a matter of law, Burchett ceased acting as its employee when he left the drilling site. Further, we conclude that a fact issue exists as to whether Burchett was acting in the course and scope of his employment when the accident occurred.

## IV. Conclusion

We hold that Amerimex is not entitled to summary judgment—on either no-evidence or traditional grounds—on Painter's vicarious-liability claim. Accordingly, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** April 13, 2018

21