

# NUMBER 13-22-00576-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE ESTATE OF DEBORA SUE MAUN, DECEASED

### On appeal from the County Court at Law No. 4 of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Tijerina**
**Memorandum Opinion by Justice Benavides**

Appellant Mark Edward Maun filed suit against the estate of his late sister, Debora Sue Maun, claiming Debora breached her fiduciary duty to Mark while serving as the independent executrix of their father's estate. The trial court granted summary judgment in favor of appellee Betty Cogar, the independent executrix of Debora's estate, on the affirmative defense of limitations. On appeal, Mark contends that summary judgment was improper because he is entitled to the benefit of the discovery rule and the fraudulent-

concealment doctrine. We affirm.

## I. BACKGROUND

Dale Oretus Maun passed away on December 20, 1985. His last will and testament designated his three children, Mark, Debora, and Dale David Maun ("David"), as equal beneficiaries of his estate and was admitted to probate in Harris County on April 9, 1986. David was initially appointed as independent executor of the estate, but after he later declined the position, Debora was appointed as successor independent executrix on February 24, 1987.

On January 3, 1989, Debora filed a sworn "Inventory, Appraisement, and List of Claims" with the probate court identifying the property held by the estate. Schedule A of the inventory listed as Dale's separate property an undivided one-third interest in five separate tracts of land: one parcel in Brooks County, and four parcels in Jim Wells County. These properties were originally owned by Dale's parents, who left the properties to Dale and his two siblings.

Debora continued to administer Dale's estate until her death on February 17, 2021. While cleaning out Debora's residence, Mark alleges that he found several boxes containing records relating to the administration of Dale's estate. These records allegedly show that Dale's estate included certain property that Debora failed to list in the inventory: oil and gas leases concerning the Brooks and Jim Wells properties that were producing royalty income, lease agreements concerning the surface estates of the Brooks and Jim Wells properties that were producing rental income, three duplexes in Nueces County that were generating income under an owner-financed sale agreement, savings bonds,

2

and a coin collection. All told, Mark estimates that Debora failed to distribute more than $200,000 in income and other property that he was entitled to receive as a beneficiary of the estate.

On November 18, 2021, Mark filed suit against Debora's estate, claiming she breached her fiduciary duty as executrix of the estate in three ways: (1) by failing to initially disclose the above assets in the 1989 inventory; (2) by failing to disclose the income generated by the estate in the ensuing years; and (3) by failing to make distributions to Mark in accordance with Dale's will. According to his pleading, Mark "discovered" these breaches while cleaning out his sister's residence in 2021.

Cogar filed an original answer pleading limitations as an affirmative defense and subsequently filed a traditional motion for summary judgment on the same grounds. Cogar argued that Mark's claims accrued outside the four-year statute of limitations for a breach of fiduciary duty claim and that the discovery rule should not apply because Mark was aware that he had an interest in the complained-of assets more than four years before he filed suit but failed to exercise due diligence to protect his rights. As support, Cogar attached portions of Mark's deposition testimony and his responses to written discovery. In both, Mark made numerous admissions regarding his knowledge about the contents of his father's estate prior to November 2017.

Among them, Mark admitted that he had known about the royalty payments concerning the Brooks and Jim Wells properties since 1994, when he began receiving his portion of the payments. Likewise, Mark also learned that the surface estates of these properties were producing rental income in 1994 when he "became involved in signing

3

leases and receiving [his] portion of the income." Mark clarified that he started receiving royalty payments and rental income in 1994 because his aunt had taken over management of the properties.

Unlike the Brooks and Jim Wells properties, the three duplexes in Nueces County were altogether omitted from the 1989 inventory. Nevertheless, Mark acknowledged that his knowledge of his father's ownership interest in these properties dates to the 1970s. He also admitted that he knew the duplexes were generating income for the estate prior to November 2017.

Similarly, although it was not listed in the 1989 inventory, Mark said he was generally aware that his father owned a coin collection at the time of his death. Mark admitted that he did not learn any additional information about the collection when he was cleaning out his sister's residence; he did not find the collection in Debora's home and does not know whether it still exists.

Finally, as to the savings bonds, the 1989 inventory attached to Mark's petition lists nine savings bonds, each with an appraised value of $25. Mark claimed during his deposition that the records in his sister's home indicated that their father owned some unspecified amount of additional savings bonds that were not listed in the inventory. Unlike the other assets, Mark claimed that he had no prior knowledge of these unlisted bonds. He did acknowledge, however, that he never received a distribution for his portion of the listed savings bonds and did not ask Debora why she failed to make this distribution.

Mark was also questioned during his deposition about what actions he took to protect his interest in the estate prior to filing suit:

[Attorney]: But you understood that, as a beneficiary, you had the right to ask your sister to do an accounting and an updated inventory of the estate, and you just didn't do so. True?

[Mark]: True.

[Attorney]: And you also knew you had the right to seek information related to the assets of the estate—including the royalty interests, including the land, including . . . any of the accounts, savings accounts, investment accounts—at any point, and you didn't do so until you filed this lawsuit. True?

[Mark]: True.

Mark filed a response to the motion arguing that he "had no reason to believe that Debora Maun was breaching her fiduciary duties to the Estate of Dale Maun, and fraudulently concealing pertinent facts relating to the administration of the Estate of Dale Maun, until her passing in 2021." Mark elaborated on his position in a supporting affidavit:

3. From 1987 to 2021, I inquired of my sister various times as to the status of my Father's estate proceeding, and specifically, whether there were any funds to be distributed to the beneficiaries. Routinely, my sister would tell me 'there is nothing left' or 'there is nothing there.' I believed her. I had no reason **not** to believe her, as she was my sister. Additionally, I did not see any evidence of wrongdoing or fraud on my sister's part in her capacity as independent executor of my father's estate from 1987 to 2021, and had no reason to inquire into potential fraud or wrongdoing from 1987 to 2021.

. . . .

5. As I was reviewing the contents of my sister's residence, I located quite a few documents and other financial records. In particular, I located many financial records indicating a significant amount of income that was paid to my father's estate, such as royalty checks, payments from farming tenants, etc., from 1987 through 2021. I did not know about this income from 1987 through 2021, and my sister did not tell me about this income. I was shocked and very surprised. After reviewing these documents, I also started to realize that my

5

sister had been depositing large sums of income, which were payable to my father's estate, into her own personal bank account. I then realized that all the occasions on which I questioned my sister regarding the status of my father's estate, she was not being truthful and concealed a significant amount [of] information. More importantly, she fraudulently concealed the fact that she had been depositing a large portion of income throughout the years into her personal bank account, which instead, should have been payable to my father's estate and to his beneficiaries.

6. Had I known any of this information before my sister's passing, I would have definitely raised this issue with her. However, again, I had no reason to believe that she was engaging in such fraudulent activities as it related to her fiduciary duties to the *Estate of Dale Oretus Maun, Deceased*. I unequivocally had no idea of these fraudulent activities carried out by my sister until I started cleaning her house after her passing in February 2021, and had no reason to inquire into potential fraud or wrongdoing prior to her passing in February of 2021.

Cogar objected to the affidavit and moved to strike it. She argued that the affidavit was not readily controvertible, contained conclusory statements, and amounted to a sham affidavit because it contained unexplained conflicts with Mark's prior testimony and discovery responses.

The trial court overruled Cogar's motion to strike but granted the motion for summary judgment. In announcing its decision, the trial court made the following remarks:

I think the statute of limitations has clearly run. The evidence seems to be overwhelming that [Mark] would have found out about this misconduct had he exercised any diligence. And in his affidavit, which I've admitted, he basically says, ["W]ell, I asked her[,] and she said there wasn't anything.["] Okay. That's not an exercise of any amount of diligence.

So I think he was on notice that there were assets that were not being distributed. He was aware of the assets[,] and he did nothing. In fact, I think it was pointed out earlier, well, he didn't see fit, I guess, to get a lawyer and demand an accounting. Well, that's exactly what he should have done, and he should have been on notice that that was required. So given the extreme amount of time that has pas[sed], I think the statute has run.

6

This appeal ensued.

## II. STANDARD OF REVIEW & APPLICABLE LAW

We review a trial court's order granting summary judgment de novo. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021). We take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Bush v. Lone Oak Club, LLC*, 601 S.W.3d 639, 646 (Tex. 2020). To be entitled to traditional summary judgment, a movant must establish that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 130 (Tex. 2018). A defendant who conclusively establishes an affirmative defense, such as limitations, is entitled to summary judgment on that claim. *Eagle Oil & Gas Co.*, 619 S.W.3d at 705 (citing *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010)).

"Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). An estate's personal representative owes a fiduciary duty to the beneficiaries of the estate. *In re Estate of Johnson*, 631 S.W.3d 56, 64 n.37 (Tex. 2021). A personal representative is held to the same fiduciary standard that a trustee owes to a trust beneficiary. *Humane Soc'y v. Austin Nat'l Bank*, 531 S.W.2d 574, 577 (Tex. 1975). This includes the duty to fully disclose any material facts that may affect a beneficiary's rights. *Huie v. DeShazo*, 922 S.W.2d 920 (Tex. 1996).

The Texas Estates Code imposes a specific duty on a personal representative to "file with the court clerk a single written instrument that contains a verified, full, and detailed inventory of all estate property that has come into the representative's possession or of which the representative has knowledge." TEX. EST. CODE ANN. § 309.051(a). Any interested person may challenge the accuracy of the inventory and have it corrected. *Id.* § 309.103. The personal representative must also file an annual accounting with the probate court until the estate is closed, detailing, among other things, the property being administered, the terms of any rental agreements, income generated by the estate, and distributions made to beneficiaries. *See id.* §§ 359.001(b)(3), (4); 359.002. If the personal representative fails to file an annual accounting, a beneficiary may file a written complaint with the probate court and "have the representative cited to file the account and show cause for the failure." *Id.* § 359.101. Fifteen months after a will is admitted to probate, "an interested person may file a written complaint in the court in which the estate is pending to have the representative cited to appear and make a written exhibit under oath that sets forth fully, in connection with previous exhibits, the condition of the estate." *Id.* § 359.006(a). Finally, an interested party may ask the probate court to remove a personal representative who misapplies or embezzles estate property. *Id.* § 361.051(6).

The statute of limitations period for a breach of fiduciary duty claim is four years. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(5). "To obtain summary judgment on limitations grounds, the movant must conclusively establish the accrual date of the cause of action." *Eagle Oil & Gas Co.*, 619 S.W.3d at 708 (citing *Diversicare Gen. Partner, Inc.*

8

*v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005)). A claim for breach of fiduciary duty accrues when the breach causes a legal injury. *Berry v. Berry*, 646 S.W.3d 516, 523 (Tex. 2022). "A legal injury occurs—and the statute of limitations begins to run—'when facts come into existence that authorize a party to seek a judicial remedy.'" *Id.* (quoting *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003)). This is true "even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *Id.* at 524 (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)).

The discovery rule and the fraudulent-concealment doctrine are judicially created exceptions that defer the accrual date of a claim, and thus, when the limitations period begins to run. *S.V.*, 933 S.W.2d at 6. The discovery rule applies to "cases in which the alleged wrongful act and resulting injury were inherently undiscoverable at the time they occurred but may be objectively verified." *Id.* We determine the applicability of the discovery rule categorically, not on a case-by-case basis. *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998). As an exception, its application "should be few and narrowly drawn." *S.V.*, 933 S.W.2d at 25. If the discovery rule applies and has been pleaded or otherwise raised, it is the movant's burden to "negate the discovery rule . . . by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury." *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999) (citing *Burns v. Thomas*, 786 S.W.2d 266, 267 (Tex. 1990)).

Fraudulent concealment, on the other hand, focuses on the defendant's improper conduct. "[W]hen a defendant has fraudulently concealed the facts forming the basis of

9

the plaintiff's claim, limitations does not begin to run until the claimant, using reasonable diligence, discovered or should have discovered the injury." *Id.* at 750 (citing *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1994)). Unlike the discovery rule, fraudulent concealment is an affirmative defense to limitations, and the party asserting it "has the burden to raise it in response to the summary judgment motion and to come forward with summary judgment evidence raising a fact issue on each element of the fraudulent concealment defense." *Id.* at 749 (first citing TEX. R. CIV. P. 166a(c); and then citing *Am. Petrofina, Inc. v. Allen*, 887 S.W.2d 829, 830 (Tex. 1994)).

Generally, determining when a plaintiff discovered an injury or whether the plaintiff exercised due diligence in discovering an injury are fact questions. *LaTouche v. Perry Homes, LLC*, 606 S.W.3d 878, 884 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (citing *Childs v. Haussecker*, 974 S.W.2d 31, 44 (Tex. 1998)). "However, if reasonable minds could not differ about the conclusion to be drawn from the facts, the commencement of the limitations period may be determined as a matter of law." *Id.* (citing *Childs*, 974 S.W.2d at 44); *see, e.g.*, *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 69 (Tex. 2011) ("Consequently, as a matter of law, the Marshalls would have been able to discover BP's fraud th[r]ough the use of reasonable diligence.").

### III.  ANALYSIS

It is undisputed that Mark's claims would be time barred without the discovery rule or the fraudulent-concealment doctrine. Mark presumes that these exceptions are generally available to him because of the nature of his claims. He maintains that he did not discover his injuries until 2021, when he was cleaning out his sister's residence. He

10

also maintains that whether he should have discovered his injuries earlier by exercising reasonable diligence is a fact question that was not conclusively proven by the summary judgment evidence. We address each exception in turn.

## A.  Discovery Rule

As a first step, we must decide whether the discovery rule categorically applies to Mark's claims. It is true, as Mark notes, that claims involving a fiduciary relationship generally fall within the ambit of the discovery rule. *S.V.*, 933 S.W.2d at 6 (first citing *Willis v. Maverick*, 760 S.W.2d 642, 645–46 (Tex. 1988) (attorney and client); and then citing *Slay v. Burnett Tr.*, S.W.2d 377, 388–93 (Tex. 1945) (trust and beneficiary)). It is also true, however, that "Texas courts have refused to apply the discovery rule to claims arising out of probate proceedings in most instances, . . . even in the face of allegations of fraud. Such claims are barred by limitations because the claimant has constructive notice of the probate proceedings." *Little v. Smith*, 943 S.W.2d 414, 420 (Tex. 1997); *see, e.g.*, *Mooney v. Harlin*, 622 S.W.2d 83, 84 (Tex. 1981) (holding a fraud claim against an executor was barred by limitations because the claimant had constructive notice of the contents of the will once it was admitted to probate). These decisions reflect "the strong public interest in according finality to probate proceedings." *Little*, 943 S.W.2d at 421.

This probate-related case is distinguishable because, for unexplained reasons, Dale's estate was never closed, and Debora continued to administer the estate until her death in 2021. Thus, "the strong public interest" associated with generally not applying the discovery rule in probate proceedings is somewhat muted in this case. *See id.* It is also not clear to us that constructive knowledge of probate proceedings would obviate the

11

need for the discovery rule where the personal representative is alleged to have secreted estate assets that were otherwise unknown to the beneficiary. *See Berry*, 646 S.W.3d at 526 (agreeing "that the discovery rule can be invoked when 'a person to whom a fiduciary duty is owed is either unable to inquire into the fiduciary's actions or unaware of the need to do so'" (quoting *S.V.*, 933 S.W.2d at 8)). However, even if we assume that the discovery rule categorically applies to the type of claims brought in this case, we conclude that Cogar affirmatively negated its application by conclusively proving that Mark knew or should have known of Debora's misconduct more than four years before he filed suit.

To start, Mark should have known something was amiss when Debora filed the 1989 inventory but failed to include the three duplexes or the coin collection. *See Little*, 943 S.W.2d at 420 (charging a claimant with constructive knowledge of probate proceedings). Mark testified that he knew these assets were part of his father's estate at the time of his death, yet he took no action to challenge the accuracy of the inventory. *See* TEX. EST. CODE ANN. § 309.103. The next indication that Debora was mismanaging the estate came when Mark never received his share of the nine savings bonds that were listed in the inventory. By 1994, when he finally began receiving his share of the royalty income and rental payments, Mark knew that his sister had also failed to list these assets in the inventory or distribute his share of the revenue since their father's death in 1985. *See Little*, 943 S.W.2d at 420. Faced with this series of troubling facts, Mark never demanded an accounting or sought to remove his sister as the personal representative of the estate. *See* TEX. EST. CODE ANN. §§ 309.103, 361.051(6). Finally, although the exact date is unclear from the record, Mark also knew that the three duplexes were

12

generating income for the estate more than four years before he filed suit and that he had never received any of this income. Again, he took no action in the probate proceeding to protect his interests.

Nevertheless, Mark relies heavily on his status as a beneficiary and the fiduciary duties his sister owed him as executrix of the estate. During the summary judgment hearing, Mark's counsel suggested that it would "turn probate law upside down on its head" to place any obligation on Mark to discover Debora's misconduct. But even "those owed a fiduciary duty are not altogether absolved of the usual obligation to use reasonable diligence to discover an injury." *Berry*, 646 S.W.3d at 526. "[W]hen the fact of misconduct becomes apparent it can no longer be ignored, regardless of the nature of the relationship." *S.V.*, 933 S.W.2d at 8. Therefore, the mere existence of a fiduciary relationship did not excuse Mark from his own obligation to exercise reasonable diligence in discovering his injuries. *See Berry*, 646 S.W.3d at 526; *S.V.*, 933 S.W.2d at 8. And under the facts of this case, we cannot say that Mark was "unable to inquire into the fiduciary's actions or unaware of the need to do so." *S.V.*, 933 S.W.2d at 8. To the contrary, Mark was aware of numerous red flags that should have led him to utilize his various rights as a beneficiary to judicially examine his sister's administration of the estate.

Mark also contends that his affidavit raises a fact issue about when he discovered or should have discovered his sister's misconduct. In it, he claims, among other things, that he was "shocked" by the records that he discovered in his sister's house and that he "unequivocally had no idea" about his sister's misconduct until that time. We agree with

13

Cogar that these types of statements in Mark's affidavit are not competent summary judgment evidence because they directly contradict his prior testimony and discovery responses, and he provided no explanation for this contradiction. *See Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 87 (Tex. 2018) (holding that "a trial court may conclude that a party does not raise a genuine fact issue by submitting sworn testimony that materially conflicts with the same witness's prior sworn testimony, unless there is a sufficient explanation for the conflict"). We hold that the trial court did not err in finding that there was no "genuine" issue of material fact as to whether Mark knew or should have known about his sister's misconduct more than four years before he filed suit. Consequently, as a matter of law, Mark is not entitled to the benefit of the discovery rule. *See Marshall*, 342 S.W.3d at 69.

## B.     Fraudulent Concealment

Mark's reliance on the fraudulent-concealment doctrine fares no better. Outside of her failure to disclose and distribute estate assets, Mark alleges in his affidavit that his sister took an additional step to conceal her misconduct. Over the decades following his father's death, Mark claims that he specifically asked his sister "various times" whether all the estate's assets had been distributed. According to Mark, Debora always assured him that the estate had been fully distributed, and he "had no reason **not** to believe her [because] she was [his] sister." But the very fact that Mark continued to question his sister "indicate[s] his awareness of the potential problem, and this awareness obligated him to make further inquiry on his own if he wanted to preserve a timely claim." *See Berry*, 646 S.W.3d at 525.

Moreover, Mark could not justifiably rely on his sister's representations given

14

everything he already knew about her misconduct. *See Marshall*, 342 S.W.3d at 68 (tolling limitations based on fraudulent misrepresentations requires the plaintiff to establish that his reliance on the representations was reasonable). Mark knew as early as 1989 that his sister had omitted valuable estate property from the inventory; namely, the three duplexes in Nueces County and the coin collection. This alone should have prompted Mark to assert his rights in the probate proceeding, before his sister made any of the complained-of misrepresentations. *See id.* ("[R]eliance is not reasonable when information revealing the truth could have been discovered within the limitations period."). Regardless, despite his sister's representations, Mark also knew that he had never received his share of the duplexes, coin collection, savings bonds, or royalty payments and rental income between 1985 and 1994. In other words, Mark knew or should have known that his sister's representations were false. *See Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424 (Tex. 2015) (per curiam) ("It is well-established that '[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.'" (quoting RESTATEMENT (SECOND) OF TORTS § 541 (1977))). We conclude, as a matter of law, that the fraudulent-concealment doctrine does not apply to Mark's claims. *See KPMG Peat Marwick*, 988 S.W.2d at 749.

## C.    Summary

We conclude that Cogar conclusively established her limitations defense. *See Eagle Oil & Gas Co.*, 619 S.W.3d at 705. Accordingly, the trial court properly granted Cogar's motion for summary judgment, and we overrule Mark's sole issue. *See id.*

## IV.   CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Delivered and filed on the
4th day of January, 2024.

16