

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| IN RE: RUDOLPH AUTOMOTIVE, LLC D/B/A RUDOLPH MAZDA and RUDOLPH CHEVROLET, LLC, <br><br> Relators. | §<br>§<br>§<br>§<br>§<br>§<br>§ | No. 08-18-00149-CV <br><br> AN ORIGINAL PROCEEDING <br><br> IN MANDAMUS |

## **O P I N I O N**

This mandamus proceeding filed in a negligence suit pits the dignity of a jury's verdict against the authority of a trial court to grant a new trial based on multiple grounds raised in post-verdict motions. Real party in interest Andrea Juarez, acting individually and in a representative capacity for her mother, Irma Vanessa Villegas,[1] moved for a mistrial and a judgment notwithstanding the jury's verdict based on: (1) the jury's conflicting answers on liability and percentage of fault, (2) the jury's award of zero and low dollar amounts for disfigurement and other line-item damages, and (3) the trial court's rulings on admission of evidence and other

---

[1] We will refer to the plaintiffs collectively as "Villegas" unless context requires us to draw a distinction between them.

matters.[2] Similarly, but more narrowly, relators Rudolph Automotive LLC d/b/a Rudolph Mazda and Rudolph Chevrolet, LLC (collectively, Rudolph or "the dealership") filed a motion to disregard the jury's answer to the question on comparative responsibility asserting that the jury's assignment of 10% fault to the dealership conflicted with its earlier no-liability finding on negligence.

The trial court ordered a new trial based on the following grounds: (1) the verdict included a fundamentally defective determination of comparative responsibility in which the jury assigned a percentage of responsibility that could not be reconciled or disregarded, and prevented the 100% total comparative responsibility required by law; (2) the determination of zero damages for several line items completely ignored undisputed facts, while other awards of damages fixed an amount that was neither authorized nor supported by the evidence, and was contrary to the great weight of the evidence; (3) that a defense expert witness intentionally injected unreliable double hearsay, non-responsive to the question asked, in an attempt to inject an improper inference before the jury, and even though the court admonished the witness and instructed the jury to try and eliminate the harm, it remained obvious to the court that the harm done could not be eliminated or removed; and (4) that the *Painter v. Amerimex Drilling I, Ltd.,*[3]decision from the Supreme Court of Texas, handed down on the same day as the verdict, altered a major legal assumption underpinning the trial. Given its order granting a new trial, the trial court further found that the motion for judgment notwithstanding the verdict and motion to disregard jury findings were rendered moot. Following these rulings, Rudolph filed this mandamus action asking this Court to direct the Honorable Patrick

---

[2] We note that we have characterized Juarez's motion for mistrial as a motion for new trial based on the impact of the trial court's ruling. The title of the motion is immaterial where it ultimately returned the case "to the posture in which it had been before trial[,]" thereby rendering the post-verdict ruling "functionally indistinguishable from an order granting a new trial." *State v. Garza*, 774 S.W.2d 724, 726 (Tex.App.—Corpus Christi 1989, pet. ref'd).

[3] *See Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125 (Tex. 2018).

Garcia, Judge of the 384th District Court of El Paso County, to vacate his order granting a new trial, harmonize the verdict consistent with Rudolph's interpretation of the jury's verdict, render judgment on the harmonized verdict, and award costs and other appropriate relief.

Because we conclude that Rudolph has not established that the trial court clearly abused its discretion in ordering a new trial, we deny the petition for writ of mandamus.

## BACKGROUND

### *Factual Background*

At the end of 2013, the Rudolph car dealership scheduled its sales team to work long hours to include eleven-hour shifts. Employees worked Monday through Saturday from 9 a.m. to 8 p.m., with the business occasionally closing as late as 10 p.m. Relevant here, the sales team included manager Marcelo Flores, and salespersons, Irma Villegas and Christian Ruiz, among others.

On December 27, 2013, Flores sent Ruiz to go buy beer—paid for by Flores—for the employees to drink. That evening, the sales team, including Flores, Ruiz, and Villegas, drank the beer while on the dealership's premises. After 8 p.m., Ruiz brought a beer to Flores who had been working at his desk on a sales report. A short time later, Flores went to the salesroom and ordered everyone who remained to leave for the day. Ruiz left the building and got into his truck to drive home. He had parked in the front sales area of the dealership lot. Close in time, Villegas also left the building and walked toward her car.

As Ruiz drove forward toward the exit of the lot, he struck Villegas with his vehicle. The impact caused Villegas to fall and strike her head on the ground; and, as a result, she sustained a severe traumatic brain injury which left her permanently paralyzed on her left side. Due to her medical treatment, a portion of her skull was necessarily removed which caused a facial deformity. As of trial, Villegas resided in a nursing home, while her daughter, Andrea Juarez, assumed

3

responsibility for her care.[4]

After the incident occurred, police officers soon arrived after receiving a call at 8:40 p.m. During the ensuing investigation, an officer on scene administered a standard field sobriety test as Ruiz admitted he had consumed two beers that evening.[5]

### *Procedural Background*

Juarez, individually and as guardian of Villegas, filed suit against the Rudolph defendants (the dealership and its employees) alleging that Ruiz had negligently struck Villegas with his vehicle, while on the premises and acting in furtherance of the business of selling vehicles, after he had consumed alcohol which was authorized and provided to him by Flores.[6] Additionally, as alternative claims, plaintiffs alleged that Rudolph had control over safety of the dealership and its premises generally, and made little or no safety policies for the protection of plaintiff and other persons to prevent injury from recognized hazards on the premises. Villegas further alleged that Rudolph failed to provide a safe work place and failed to adequately train and supervise its employees. Lastly, as an independent claim, Villegas filed a claim of negligence against Ruiz.

Prior to trial and relevant to this mandamus, Villegas filed a motion for partial summary judgment asserting that the evidence established that both she and Ruiz were acting in the course and scope of employment at the time of her injury as a matter of law. Villegas described that the collision occurred "on Rudolph's premises at a place intended by Rudolph for use by its employees to drive their vehicles and park, and in an area where employees performed services for Rudolph." Villegas asserted that the long-standing access/premises doctrine applied such that Ruiz and

---

[4] On September 13, 2020, Villegas died during the pendency of this appeal.

[5] During trial, toxicologists retained by both sides agreed that Ruiz's blood-alcohol concentration (BAC) was estimated as .02 percent, as shown by later testing, at the time of the impact.

[6] Our mandamus record includes "Plaintiff's Supplemental Petition of January 12, 2018."

Villegas were deemed as acting in the course of employment at the time of the incident regardless of whether they were "off the clock" when it occurred.

Responding to this motion, Rudolph asserted that Villegas had applied the wrong legal standard and misinformed the court on the correct analysis of course and scope of employment. Rudolph asserted it was "known and undisputed that Rudolph [is] a non-subscriber," and as a consequence, "Texas common law governs this Court's analysis of the course and scope issue." Rudolph further asserted that Ruiz and Villegas were not acting in the course and scope of employment at the time of the incident as both were leaving the dealership after they had finished their work. In footnote one, Rudolph pointedly argued as follows:

> Ruiz is the only relevant actor for the course and scope analysis when considering whether Rudolph is either vicariously liable or liable via respondeat superior. The question of whether Ms. Villegas was in the course and scope of employment is only relevant to whether Rudolph has access to certain common law defenses, including contributory negligence. If Ms. Villegas was in the course and scope of her employment at the time of the accident, then Rudolph may lose its ability to use certain common-law defenses.

Rudolph cited to *Painter v. Amerimex Drilling I, Ltd*., 511 S.W.3d 700, 701 (Tex. App.—El Paso 2015) (*Painter I*), *rev'd*, 561 S.W.3d 125 (Tex. 2018) (*Painter II*), a vicarious liability case from this Court which had been, by then, granted discretionary review by the Supreme Court of Texas but had not yet been finally resolved. After quoting from *Painter I*, Rudolph argued that the proof necessary to place an employee within the course and scope of employment in a vicarious liability case versus a workers' compensation case differed and required a higher standard of proof. Arguing her claim fell under the Texas Workers' Compensation Act, Villegas replied that there was "no reason to use a double standard to determine course and scope of employment in direct action (non-subscriber) cases and workers' compensation cases, especially where the plaintiff was an employee injured by a fellow employee on the premises of the employer with the manager on duty . . . ." And more specifically addressing and distinguishing from *Painter I*, Villegas argued

5

the case involved a different legal theory than hers given that the underlying collision which caused the injury had occurred miles away from the jobsite, not on the work premises.

Neither party points us to a ruling on Villegas's motion for partial summary judgment. Yet, we can surmise from our record that the trial court remained unconvinced that the course and scope issue could be decided as a matter of law. Our record shows that once plaintiffs rested their case in chief, the trial court again considered the course and scope issue, but this time raised by Rudolph. By a motion for directed verdict, Rudolph argued that the evidence established that Ruiz had not been acting in the course and scope of his employment at the time of the occurrence as a matter of law. After the trial court denied a directed verdict, the issue of course and scope, relative to all three employees, Villegas, Ruiz, and Flores, was submitted to the jury as a fact question (Question 1), along with corresponding questions of negligence and comparative responsibility (Questions 2, 3, and 4).

### Trial and the Jury's Verdict

Following a nearly three-week trial, the jury ascribed negligence to Flores, Ruiz and Villegas, but none to Rudolph. On the question of course and scope, the jury found that manager Flores was acting in the course of his employment, but Villegas and Ruiz were not. The jury assigned percentages of fault as follows: Rudolph (10%), Flores (25%), Ruiz (35%), and Villegas (30%).

In total, the jury awarded roughly $4 million in damages to plaintiffs. At issue here, the jury found zero for past disfigurement yet determined $200,000 for future disfigurement; zero for Juarez's provision of past household services to her mother, but $150,000 for such provision of future services; zero for past or future loss of parental consortium; and, lastly, $25,000 to Villegas

6

for past and future pain and suffering and a like amount for past and future impairment. [7]

After the jury returned its verdict, they were discharged by the trial court without objection. That same day, the Supreme Court of Texas handed down its decision in *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 139 (Tex. 2018) (*Painter II*), in which it reversed our judgment and remanded the case to the trial court for further proceedings. In *Painter II*, the Supreme Court found that genuine issues of material fact precluded summary judgment in favor of the employer on the issue of course and scope of employment. *Id.*

### *Post-Verdict Proceedings*

Following the verdict and discharge of the jury, Rudolph filed a motion to disregard the jury's finding to Question 4, in which the jury assigned 10% comparative fault to the dealership, and for entry of judgment on the remainder of the verdict. Because the jury answered that Rudolph was not negligent in Question 2, the dealership argued that the jury's answer to Question 4 was immaterial. Rudolph asked the trial court to disregard the jury's answer to Question 4, as to it only, and apart from that one change, to sign a judgment on the remaining jury findings. Villegas also asked for post-verdict relief by filing a motion for judgment notwithstanding the verdict and to enter judgment, as well as a motion for mistrial. In the motion for mistrial, Villegas and Juarez asserted eight grounds in support of the granting of a new trial.

The trial court granted the motion for mistrial, and in doing so, identified as meritorious some but not all grounds advanced by Villegas. This mandamus action followed.

### DISCUSSION

Rudolph's petition for mandamus review presents six issues with the first being an

---

[7] For completeness, we detail here the other damages awarded by the jury not otherwise listed above: past medical care of $630,000, and future medical care of $2,500,000; past physical impairment of $25,000, and future physical impairment of $25,000; past loss of earning capacity of $150,000, and future loss of earning capacity of $240,000; past mental anguish of $25,000, and future mental anguish of $25,000.

overarching issue questioning the validity of the new trial order. Five sub-issues then follow which challenge the four grounds articulated by the trial court in the new trial order. Overall, Rudolph generally contends that none of the grounds articulated by the trial court support the grant of a new trial either on their face or on their merits.

To begin, we first detail the standards required of mandamus review.

## I.

## A.

### General Mandamus Standard

To obtain a writ of mandamus, a relator must show two things: (1) a clear abuse of discretion by the trial court and (2) no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135-36 (Tex. 2004). The Supreme Court of Texas has recognized that there is no adequate appellate remedy when a trial court issues an erroneous order for new trial. *In re Columbia Med. Ctr. of Las Colinas*, 290 S.W.3d 204, 209-10 (Tex. 2009). As such, the second prong of the mandamus test is established in this instance. We focus our inquiry, then, on the first prong only, the question of whether the trial court clearly abused its discretion.

## B.

### Mandamus Review of New Trial Orders:
### *Columbia Medical Center, United Scaffolding,* and *In re Toyota*

The use of mandamus to challenge new trial orders has been subject to much change in recent years. Historically, however, Texas trial judges wielded virtually unfettered discretion to order new trials. *Cummins v. Paisan Const. Co.*, 682 S.W.2d 235, 236 (Tex. 1984) (trial court's order setting aside a default judgment and granting a new trial is not reviewable on appeal); *see also Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 918 (Tex. 1985) ("Trial courts have always had broad discretion in the granting of new trials."). Indeed, prior to 2004, appellate courts

could not review orders granting a motion for new trial rendered within the trial court's plenary power period except in very limited circumstances. *See Wilkins v. Methodist Health Care Sys.*, 160 S.W.3d 559, 563 (Tex. 2005) (citing *Johnson*, 700 S.W.2d at 918).

Notably, in 2009, the Supreme Court of Texas observed that the significance of protecting the right to a jury trial made the issuance of a new trial order an "exceptional" circumstance that justified mandamus review. *Columbia Med. Ctr.,* 290 S.W.3d at 209. The Court recognized that certain harm resulted when a trial court's new trial order failed to sufficiently articulate its reasoning. *Id*. The *Columbia* Court described that "even if an unfavorable verdict were reversed and rendered in Columbia's favor, Columbia would have lost the benefit of a final judgment based on the first jury verdict without ever knowing why, and would have endured the time, trouble, and expense of the second trial. Under the circumstances, Columbia does not have an adequate appellate remedy." *Id*. at 209-10.

Consequently, the Supreme Court imposed a new specificity requirement on new trial orders, stating that even while it was not "retreat[ing] from the position that trial courts have significant discretion in granting new trials," trial judges could no longer simply state that they made the decision to grant a new trial "in the interest of justice." *Id*. at 212-13. "[S]uch a vague explanation in setting aside a jury verdict[,]" the Court wrote, "does not enhance respect for the judiciary or the rule of law, detracts from transparency we strive to achieve in our legal system, and does not sufficiently respect the reasonable expectations of parties and the public when a lawsuit is tried to a jury." *Id*. at 213. Instead, *Columbia* determined that trial judges were required to give an "understandable, reasonably specific explanation" in their new trial orders. *Id*.

Shortly thereafter, when deciding the case of *In re United Scaffolding, Inc.,* 377 S.W.3d 685, 688 (Tex. 2012), the Supreme Court further addressed the information that would constitute

an understandable, reasonably specific explanation. There, in addressing the level of detail needed for a facially valid order, the Supreme Court particularly noted that trial courts were not expected to meet the same standard as is imposed on appellate courts. *Id*. at 687-88 (describing the review standard imposed by *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)). "Imposing a *Pool*-like standard on trial courts would weigh too heavily against trial courts' discretion, since that standard would frequently be impossible for a trial court to meet." *Id*. at 687. For it is recognized that an appellate court is able to (and must) go into detail as to its reasons for overturning a jury verdict because the appellate court has a court reporter's record at its disposal, whereas trial courts largely "must rely on their own observations" about what happened at trial at the time they render their decisions. *Id*. at 688.

Given these distinctions, *United Scaffolding* concluded that trial courts are afforded considerable discretion in ordering new trials based on two justifications, one being jurisprudential and the other practical. *Id*. at 687. Regarding jury trials, the Supreme Court acknowledged that "trial judges actually attend[ed] the trial and are best suited to evaluate its deficiencies . . . ." *Id*. Consequently, it further explained that "most trial judges are understandably reluctant, after presiding over a full trial, to do it all over again." *Id*. When considering how detailed a trial court's new-trial order must be and what level of review to apply, reviewing courts are thus instructed to afford jury verdicts appropriate regard but also to respect trial courts' significant discretion in the matter of granting a new trial. *Id*.

*United Scaffolding* clarified that the specificity standard could be met if the trial judge provided "a cogent and reasonably specific explanation of the reasoning that led the court to conclude that a new trial was warranted." *Id*. at 688. To pass muster, the new trial order must demonstrate on its face that "the jury's decision was set aside only after careful thought and for

10

valid reasons." *Id*. More specifically, *United Scaffolding* described that a trial court did not abuse its discretion if the stated reason for granting a new trial: (1) is a reason for which a new trial is legally appropriate (such as a well-defined legal standard or defect that probably resulted in an improper verdict); and (2) it is specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reasons from the particular facts and circumstances of the case at hand. *Id*. at 688-89.[8]

Moving beyond facial validity, the Supreme Court next addressed "whether an appellate court may, in an original proceeding, determine whether the reasonably specific and legally sound rationale is actually true." *In re Toyota Motor Sales, USA, Inc.*, 407 S.W.3d 746, 749 (Tex. 2013). Overturning decades of precedent and describing its decision as the next step in the logical progression set by *Columbia* and *United Scaffolding*, the *In re Toyota* Court determined that, "an appellate court may conduct a merits review of the bases for a new trial order after a trial court has set aside a jury verdict[,]" and that if "the record does not support the trial court's rationale for ordering a new trial, the appellate court may grant mandamus relief." *Id*.

Condensed down to core principles, the *Columbia*, *United Scaffolding*, and *In re Toyota*

---

[8] In *United Scaffolding*, the trial court's order articulated four reasons—including the impermissible reason "in the interest of justice and fairness"—that were all linked together by the connector "and/or." Because the use of and/or left open that possibility that "in the interest of justice" was the sole rationale, the Supreme Court of Texas granted mandamus relief, vacated the amended order based on the ambiguity, and outlined further steps the trial court needed to take to make its order facially valid. *Id*. at 689-90. The *United Scaffolding* Court identified the following as reasons that would not pass muster under *Columbia*:

- The reason given is legally invalid.
- The reason plainly stated that the trial court merely substituted its own judgment for the jury's.
- The reason was that the trial court simply disliked one party's lawyer.
- The reason was based on invidious discrimination.
- The reason is "rubber-stamped with a valid new-trial rationale" but "provides little or no insight into the judge's reasoning" (i.e. it involves the "mere recitation of a legal standard" that does not show "the trial judge considered the specific facts and circumstances of the case at hand and explain[ed] how the evidence (or lack of evidence) undermines the jury's findings").
- The order provides "no more than a pro forma template . . . ."

*Id*. at 689.

line of cases established a two-step analysis for deciding whether a trial court acted within the scope of its discretion in ordering a new trial. First, we determine whether the ground stated in the new trial order is specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reason from the particular facts and circumstances of the case at hand. Second, we then determine whether the reason articulated is one for which a new trial is legally appropriate (such as a well-defined legal standard or defect that probably resulted in an improper verdict). *See United Scaffolding,* 377 S.W.3d at 688-89; *see also In re Toyota,* 407 S.W.3d at 749. Under the first prong, our focus is "not on the length or detail of the reasons a trial court gives, but on how well those reasons serve the general purpose of assuring the parties that the jury's decision was set aside only after careful thought and for valid reasons." *United Scaffolding*, 377 S.W.3d at 688. When a trial court order facially complies with those requirements, the second prong then requires a review of the correctness of the trial court's decision on its merits. *In re Toyota,* 407 S.W.3d at 758. If a trial court's articulated reasons for granting a new trial are not supported by the underlying record, the new trial order cannot stand. *Id*.

## II.

## A.

### The Comparative Responsibility Answer as to Rudolph

In Issue Two, the first sub-issue, Rudolph asserts that the trial court abused its discretion by granting a new trial based on the jury's answer to questions on negligence and comparative-responsibility. Rudolph asserts a series of arguments: (1) that the trial court's reason is facially invalid, (2) that there is no irreconcilable conflict, as to Rudolph, between the jury's findings of negligence and comparative-responsibility, (3) that the trial court was obligated to harmonize the jury verdict, and (4) even if the findings were irreconcilably conflicted, a new trial was improper

12

because Villegas did not object on a timely basis.

Although we proceed out of order, we necessarily begin with the last argument raising an issue of error preservation.

1.

Even when reviewing error from the procedural posture of mandamus as opposed to direct review, we must address the threshold matter of preservation of error as errors not properly preserved cannot generally form the basis for a grant of new trial under the merits review of *In re Toyota*. 407 S.W.3d at 761-62 (reversing a new trial grant that was based in part on error that was not preserved); *In re State*, No. 14-18-01036-CV, 2018 WL 6722351, at *3-*4 (Tex.App.—Houston [14th Dist.] Dec. 21, 2018, orig. proceeding) (mem. op.) (failure to obtain a ruling on a motion in limine and failure to object when evidence was admitted waived both errors and prevented them from being used as a basis for a new trial grant); *In re Waste Management of Tex., Inc.*, 392 S.W.3d 861, 870 n.13 (Tex.App.—Texarkana 2013, orig. proceeding) (preservation requirement applies in mandamus proceedings). That said, there are some instances in which a motion for new trial itself acts as a vehicle for preservation of error. The question here, then, is whether Villegas's post-verdict motion could serve to preserve error sufficient to allow this Court to perform a merits review of the trial court's grant of a new trial based on purportedly conflicting answers in the jury verdict.

Rule 295 of the Texas Rules of Civil Procedure provides that if a jury's answers to questions in a purported verdict are in conflict, the trial court must instruct the jury of the nature of the problem, give the jury additional instructions as necessary, and allow the jury to deliberate further. TEX. R. CIV. P. 295. In light of this rule, we have previously held that if a party wants to preserve error with regard to a defective jury verdict, "[t]he trial court must be made aware of the

13

conflict before the jury is discharged because, once the jury is discharged, a conflict in the jury's answers cannot be reformed." *Rhey v. Redic*, 408 S.W.3d 440, 464-65 (Tex.App.—El Paso 2013, no pet.) (internal citations and quotation marks omitted). Here, it is undisputed that after the jury rendered its verdict, but before it was discharged, the Villegas plaintiffs did not bring the issue to the trial court's attention.

However, in *Rhey*, we were not asked to address nor did we face the issue of whether a post-discharge motion for new trial could also serve to preserve error. Thus, while *Rhey* confirmed that a motion to correct the verdict is one way of preserving error in a conflicting jury verdict, it did not preclude or otherwise address the possibility that there are other ways to preserve such error. To date, the Supreme Court of Texas has not definitively answered that question—indeed, the last time the issue arose, the Court splintered into three plurality positions, none of which garnered a majority. *See USAA Texas Lloyds Company v. Menchaca*, 545 S.W.3d 479, 517-19 (Tex. 2018).[9] Absent guidance from our highest court, we find this to be an open question.

We turn, then, to Rule 33.1, the general standard for preservation of error set by the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 33.1(a). To demonstrate preservation of a complaint for appellate review, Rule 33.1 requires the record to show:

(1) the complaint was made to the trial court by a timely request, objection, or motion that:

    (A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of

---

[9] In *Menchaca*, a three-justice plurality held that a post-discharge motion for new trial was not sufficient to preserve error; instead, a motion to correct the verdict prior to discharge of the jury was required. 545 S.W.3d at 517-19 (plurality op. by Boyd, J., joined by Lehrmann and Devine, JJ.). Yet, a four-justice plurality held that the failure to object to conflicting answers before the trial court discharged the jury should not prevent appellate courts from reviewing the merits of the conflict. *Id.* at 526-31 (Green, J., dissenting, joined by Hecht, C.J., and Guzman and Brown, JJ.). Justice Blacklock concurred in the Court's judgment without opinion, and Justice Johnson did not participate in the decision. *Id.* at 521. Neither plurality opinion thus commanded the five votes necessary to become binding precedent. *See Univ. of Tex. Med. Branch at Galveston v. York*, 871 S.W.2d 175, 177 (Tex. 1994) (Texas Supreme Court plurality opinions do not constitute binding authority "[b]ecause the principles of law involved have not been agreed upon by a majority of the sitting court").

the complaint, unless the specific grounds were apparent from the context; and

    (B) complied with the requirements of the Texas Rules of Evidence or the Texas Rules of Civil or Appellate Procedure; and

(2) the trial court:

    (A) ruled on the request, objection, or motion, either expressly or implicitly; or

    (B) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal.

TEX. R. APP. P. 33.1(a).

Rule 33.1 governs the preservation of error unless another rule applies. Although Rule 295 of the Texas Rules of Civil Procedure governs the procedure for correcting a verdict, the rule itself does not address the issue of error preservation. As such, we may rely on Rule 33.1 of the Texas Rules of Appellate Procedure to determine if error was preserved. We hold that, in addition to a motion to correct the verdict under TEX. R. CIV. P. 295, a motion for new trial can also preserve a defect in a jury charge under TEX. R. APP. P. 33.1 because the post-trial motion brings the error to the trial court's attention close enough in time to provide it an opportunity to correct the error by ordering a new trial before appellate proceedings begin. We agree with the four-justice plurality in *Menchaca* that "[g]enerally, a party should object to conflicting answers before the trial court dismisses the jury. The absence of such an objection, however, should not prohibit us [as an appellate court] from reaching the issue of irreconcilable conflicts in jury findings." *Menchaca*, 545 S.W.3d at 526-28 (Green, J., plurality op.).

In the absence of a motion to correct the verdict or a post-verdict motion such as a motion for mistrial or new trial—which cites a purportedly conflicting verdict as a basis for seeking relief—*Rhey* would apply, and error would not be preserved. But given that Villegas filed post-

15

verdict motions that identified the conflicting jury answers as a ground for relief, we conclude that this basis for granting a new trial was properly raised with the trial court and not waived.

2.

Rudolph next contends the new trial order is facially invalid in that it fails to state why the trial court could not harmonize and reapportion the percentages of fault as it was required to do.

As earlier stated, a trial judge has significant discretion in ordering new trials. *Columbia Med. Ctr.*, 290 S.W.3d at 212. Such discretion, however, does not permit a trial judge to substitute his or her own views for that of the jury without a valid basis. *Id.* To be valid, the trial court's reason must be understandable and reasonably specific. *Id.* at 213. It must serve the general purpose of assuring the parties that the jury's decision was set aside only after careful thought and for valid reasons. *United Scaffolding,* 377 S.W.3d at 688. In other words, it must indicate that the trial court did not simply parrot a pro forma template but derived its reasons from the particular facts and circumstances of the case at hand. *Id.* at 689.

Regarding this ground, the new trial order states as follows:

The Court finds that the jury determination of comparative responsibility of Rudolph Mazda in Question 4 is error that cannot be reconciled nor disregarded, and prevents the 100% total comparative responsibility required by law. Without 100%, the comparative responsibility finding is fundamentally defective.

In post-verdict motions, both parties addressed the jury's answer to Question 4. Although both sides agreed that the answer to Question 4 created a conflict with other answers, they advocated for directly opposite responses from the trial court. Considering the whole verdict, Villegas argued the answer to Question 4 was fatally irreconcilable and could not be disregarded. In Question 1 and 2, Villegas asserted that the jury concluded that Rudolph's manager, Flores, was negligent in the course and scope of his employment and proximately caused the occurrence. Villegas further noted that the jury had been instructed that Rudolph acted by and through its

16

employees, agents, and representatives. Yet, in the negligence questions, Question 2 and 3, the jury found no negligence as to Rudolph. Nonetheless, Question 4, on comparative responsibility, the jury attributed 10% fault to Rudolph, which amount was included in arriving at 100% responsibility. As to Rudolph, Villegas argued the jury's answers to this series of questions was fatally irreconcilable and could not be voided.

Rudolph countered that the jury's answer to Question 4 was immaterial given its findings of no liability in Questions 2. Rudolph asserted that the answer to Question 4, as to it, should simply be disregarded.

Here, we understand the trial court to say that the apportionment of 10% responsibility to Rudolph in Question 4 is irreconcilable with the jury's other findings of no negligence as shown in Question 1 (course and scope), Question 2 (general negligence), and Question 3 (premises liability). The new trial order articulates that the court found that "Question 4 is error [in] that [it] cannot be reconciled nor disregarded" and "prevents the 100% total comparative responsibility required by law." The basis given, which is supported by the record, provides an understandable and reasonably specific explanation for granting a new trial, particularly when it is considered in context with the parties' post-verdict arguments. *See Columbia Med. Ctr.,* 290 S.W.3d at 213.

Facial validity is established. We proceed to an analysis of the merits of this new trial ground.

3.

Having decided that the explanation is facially valid, we next review the new trial order on its merits as required by *In re Toyota*. Rudolph argues that the trial court could not have granted a new trial on the ground of conflicting jury answers because a no-negligence finding in one part of the verdict controls over a corresponding apportionment of liability in another, and the no-

17

negligence finding renders the apportionment finding immaterial for purposes of entering judgment.

In discussing conflicting jury findings such as this one, this Court has previously validated the general principle advanced by Rudolph, holding that "a trial [c]ourt properly harmonizes any apparent conflict between a specific finding of no negligence as to a defendant in the liability issues and an apportionment of negligence in the subsequent comparative negligence" by "enter[ing] a judgment for the defendant, the rule being that the specific finding directed toward the liability aspect of the verdict controls over the general finding of comparative negligence." *See Garza v. Waco Scaffold & Shoring Co.*, 576 S.W.2d 442, 446 (Tex.App.—El Paso 1978, writ ref'd n.r.e.). Likewise, the proposition that there is no fatal conflict when "the jury finds a party is not negligent but then apportions to it a percentage of fault" because "[i]ssues establishing or negating liability control over the issue which apportions, rather than establishes negligence" is the law as understood by several of our sister courts. *See Beltran v. Brookshire Grocery Co.*, 358 S.W.3d 263, 269-70 (Tex.App.—Dallas 2011, pet. denied) (surveying cases from the San Antonio, Houston [1st Dist.], Tyler, Corpus Christi, Waco, and Dallas courts of appeals holding that a no-negligence finding in a verdict renders a subsequent apportionment finding as to that party immaterial).

Having reviewed this mandamus record, however, we conclude that this case does not present a circumstance where the jury found Rudolph *not* liable and then assigned it a percentage of liability. If such were the case, then *Garza* would apply. Instead, the jury in this instance found that Rudolph employee Marcelo Flores was negligent (Question 1), while acting in the course and scope of his employment (Question 2), but that Rudolph itself was *not* negligent (Question 3), yet also finding that Flores was 25% responsible and Rudolph was 10% responsible (Question 4) for

18

plaintiff's injuries. By instruction number two, the jury was informed that "[a] corporation acts by and through its employees, agents and representatives." These findings are conflicting and do not allow for neat harmonization. In fact, these findings, all of which deal in part with Rudolph's negligence and its apportioned responsibility, cannot be reconciled particularly in light of the fact that the jury attributed negligence to Flores while he was acting in the course and scope of his employment as a Rudolph manager. Because these determinations cannot be harmonized, we conclude that *Garza* does not apply.

The findings are irreconcilable, and the trial court did not err by basing its decision to grant a new trial on this ground. We find that this ground is sufficient to support the grant of a new trial.

Accordingly, we overrule Issue Two.

**B.**

**The Course and Scope of Employment, the Exception to the Coming-and-Going Rule, and the Impact of *Painter v. Amerimex***

In Issue Three, the second sub-issue, Rudolph argues that the trial court abused its discretion in granting a new trial to reconsider whether Rudolph's two employees, Villegas and Ruiz, were acting in the course and scope of employment as a matter of law based on the Supreme Court of Texas's decision in *Painter v. Amerimex (Painter II)*. By directly citing *Painter II*, the trial court essentially identified that *Painter I*, which operated as controlling authority in our district during the trial, impacted the trial court's rulings on pretrial motions, the presentation of evidence during trial, and the charge given to the jury.

1.

Rudolph first contends that we need not reach the merits of the debate over *Painter II's* impact because the new trial order is facially invalid in describing its reasoning. We disagree.

Recall that the portion of the trial court's new trial order dealing with the effect of *Painter*

19

reads as follows:

> As an additional and independent basis for new trial, the Court finds that the Texas Supreme Court decision in Painter v. Ameri[m]ex rendered on April 213, 2018, [sic] the day of this Jury Verdict, was important law that affected the earlier decision s [sic] of this Court on motions filed by the parties, the evidence presented at trial and the charge given to the Jury. Based on the Painter opinion and other relevant decisions and authority as set forth in Plaintiff's Motion for Judgment NOV, it appears to this Court that it needs to reconsider whether Irma Vanessa Villegas and Christian Ruiz were injured in the course of employment as a matter of law which would make Plaintiff's claim a non-subscriber negligence case under 406.[0]33 of the Texas Labor Code, and combined with the evidence admitted at trial, find negligence as a matter of law, thereby leaving only the issue of damages for determination [sic].

As earlier stated, *United Scaffolding* merely requires a cogent and reasonably specific explanation of the reasoning that led the court to conclude that a new trial was warranted. 377 S.W.3d at 688. Although the order need not provide a *Pool*-like detailed analysis, it will not stand if it provides little or no insight into the judge's reasoning. *Id.* at 687-88.

In this instance, we find that the trial court's order was cogent, reasonably specific, and demonstrated that the trial court did not merely parrot legal standards without consideration of the facts. We understand the trial court to say generally that *Painter I* so permeated trial proceedings from beginning to end that a new trial was warranted. Specifically, the trial court states that the decision affected (1) its rulings on motions brought by the parties, including previous motions for summary judgment; (2) the evidence presented at trial; (3) the charge given to the jury; and (4) whether under the *Painter II* standard the trial court needed to find that Villegas and Ruiz were injured in the course of employment as a matter of law, leaving only damages as an issue for jury resolution.

Facial validity is established. Thus, we proceed to an analysis of the merits of whether this ground supports a grant of new trial.

20

2.

A threshold issue in this case required the trial court to determine whether Villegas and Ruiz were deemed as acting in the course and scope of employment as a matter of law given that Rudolph had not only conceded the employee status of both individuals, but also conceded its ownership of the premises where Villegas sustained her injury. Basing its case in the trial court largely on a distinction this Court drew in *Painter I*, Rudolph argued that, under a task-based right to control standard, neither Villegas nor Ruiz were acting in the course and scope of their employment with Rudolph at the time of the incident. Specifically, Rudolph argued it did not exercise control over the actions of either employee at the time of the incident, as both were off duty when the incident occurred.

To resolve the mandamus challenge as to this disputed issue, we must answer three questions. First: Did the *Painter I* decision affect the way this case was tried by wrongfully demanding a task-based, on-the-clock versus off-the-clock approach to determining course and scope of employment rather than relying on precedents applicable when employment status is not at issue? Second: If so, was Rudolph subject to direct liability—as a nonsubscriber employer— due to Villegas sustaining injuries, while on premises, proximately caused by a fellow employee; or, did the coming-and-going rule preclude recovery? Third: If the exception to the coming-and-going rule, or the so-called premises/access doctrine, should be applied to this case, was error harmless given that Villegas received a jury instruction that included language from that doctrine?

a.

### *The Change in Law from Painter I to Painter II*

The *Painter* cases involved a vehicle accident that occurred after a group of Amerimex employees working on an oil drilling project had finished their shift and were in transit, on a remote

public road, headed to a bunkhouse located thirty or forty miles from the worksite. *Painter I*, 511 S.W.3d at 702. Amerimex provided the bunkhouse as living quarters for the crew. *Id.* Employee J.C. Burchett, a crew leader, drove the vehicle. *Id.* Amerimex provided Burchett with daily bonus payments if he provided other employees with transportation to the drill site to ensure they were not hired away by other drillers in the area. *Id.* Following the accident, Burchett sought workers' compensation benefits from Amerimex's insurance carrier, but the passengers in the vehicle forewent any such claims, and instead, filed suit against Amerimex not as employees but as third-party plaintiffs. *Id.* at 703. One of the passengers' theories of liability, which was severed from other theories, contended that Amerimex was vicariously liable for Burchett's actions because Burchett was acting in the course and scope of his employment at the time of the accident. The trial court granted summary judgment in favor of Amerimex on that theory, finding no vicarious liability under the circumstances. Painter and the other passengers appealed to this Court. *Id.* at 703-04.

On appellate review, this Court held that the definition of course and scope used in the workers' compensation context differed from the definition used in the common-law-vicarious-liability context because the workers' compensation definition was grounded in a statute that required liberal construction of its terms in favor of injured workers, whereas the common law definition that applied to third-party claims imposed no such presumption. *Id.* at 708-09. We further held that while Painter may have raised a fact issue on course and scope under the workers' compensation standard, he could not raise a fact issue under a vicarious liability standard because:

(1) workers' compensation law arose in the context of a pervasive statutory scheme enacted by the Legislature to carefully balance competing interests, whereas vicarious liability was a matter of pure policy determination and risk-shifting under the common law, making the analytical approach between the two areas of law substantively different; and, consequently,

(2) the common law vicarious liability standard was more stringent than the workers' compensation standard and required specific proof that the employer had the right to control the activity in question, which the Court defined under the circumstances to include specific control over the manner of travel or the route. *See id.* at 708-09 & 711.

Based on this distinction, we affirmed the trial court's grant of a no-evidence summary judgment motion, on the course and scope of employment element, finding no evidence showing that "Amerimex had or exercised any control over the manner of transportation—the type of vehicle used, the qualifications of the driver, the number of passengers, or any other issues which might implicate the kind of control that justifies shifting the risk of loss from one party to another." *Id.* at 712-13.

Finding error with our analysis, the Supreme Court of Texas reversed *Painter I* and remanded the case for further proceedings. *Painter II*, 561 S.W.3d at 128. As a starting point, the Supreme Court described the doctrine of respondeat superior, or vicarious liability, as meaning "liability for one person's fault may be imputed to another who is himself entirely without fault solely because of the relationship between them." *Id.* at 130. This common law doctrine reflects, "a deliberate allocation of risk in line with the general common law notion that one who is in a position to exercise some general control over the situation must exercise it or bear the loss." *Id.* at 131 (internal quotations omitted). Notably, *Painter II* highlighted the employer-employee relationship as "one implicating the doctrine's risk-shifting policies." *Id.*

To recover on a third-party claim based on vicarious liability, *Painter II* reiterated that a plaintiff must show that, at the time of the allegedly negligent conduct, the worker (1) was an employee and (2) was acting in the course and scope of his employment. *Id.* Generally, as *Painter II* explained, an employer "is insulated from liability for the tortious acts of its independent contractors." *Id.* Accordingly, disputes may arise over whether a particular worker acted as an

23

independent contractor rather than as an employee. *Id*. As to the first element, then, courts examine "whether the employer has the right to control the progress, details, and methods of operations of the work." *Id*. (citing *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002)). Elaborating on the course-and-scope element when employment status is not disputed, *Painter II* further described that vicarious liability arises only if the tortious act falls within the scope of the employee's "general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired." *Id*. (citing *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007). "[T]he act must be of the same general nature as the conduct authorized or incidental to the conduct authorized." *Id*. (internal quotations omitted). "[I]f an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation." *Id*.

Contrary to our decision in *Painter I*, the Supreme Court held that the task-based, right-to-control test was not relevant to the second prong of the analysis, that is, the determination of whether an employee was acting within the course and scope of employment. *Id*. at 132. Rather, the right-to-control test applied solely to the first prong of determining whether an actor is deemed an *employee or independent contractor*, and whether a third party can hold the employer liable (for actions of an employee) or not liable (for actions of an independent contractor). *Id*. at 131-32. *Painter II* reiterates that when an employer-employee relationship "is undisputed, the employer essentially concedes the existence of the right to control that is necessary to give rise to the relationship." *Id*. at 132. Because Amerimex conceded that Burchett worked as its employee, the focus of the inquiry shifted to whether he was acting within the course and scope of employment at the time he was driving from the drill site to the bunkhouse. *Id*. The Court clarified that "[t]he employer's right to control the work, having already been determined in establishing the employer-

24

employee relationship, is not part of this analysis." *Id*. at 132-33.

Pursuant to the so-called coming-and-going rule, Amerimex argued that an employer is generally not liable for the acts of its employees while the employee traveled to and from work. *Id*. at 135. As to this argument, *Painter II* acknowledged: "[w]e have long recognized a version of this principle in the workers'-compensation context, holding that as a general rule an injury received while using the public streets and highways in going to or returning from the place of employment is not compensable because not incurred in the course of employment." *Id*. at 136 (citing *Tex. Gen. Indem. Co. v. Bottom*, 365 S.W.2d 350, 353 (Tex. 1963) (a case arising under the Texas Workers' Compensation Act) and TEX. LABOR CODE ANN. § 401.011 (12) (defining "course and scope of employment in Workers' Compensation Act to exclude, with limited exceptions, "transportation to and from the place of employment")) (internal quotations omitted). *Painter II* thus confirmed that the coming-and-going rule and the special assignment exception to that rule, both of which are concepts borne from workers' compensation jurisprudence, continued to apply when determining vicarious liability. *Id*. This holding ran contrary to *Painter I*, in which we held that the standard for determining course and scope of employment under the vicarious liability standard was both different and more stringent than the standard set forth under applicable workers' compensation law.

Applying the coming-and-going rule and its exceptions to the question of whether an employee was acting within the course and scope of employment, *Painter* II concluded that a fact issue existed with regard to the third-party claims of the passengers: that is, the evidence showed that one of Burchett's specific duties included his provision of transportation of his crew to and from the drilling site, which benefitted Amerimex, who needed the crew to show up for each shift as planned. *Id*. at 135. The fact that Amerimex chose not to control the specific details of the

25

transportation arrangement did not change the fact that Amerimex inherently retained the ability to control those details given Burchett's employment. *Id*. Because the evidence raised at least a fact issue, the Supreme Court reversed the grant of summary judgment and remanded the case for further proceedings. *Id*.

In summary, *Painter I*, which operated as controlling law during the bulk of trial proceedings in this case, wrongly held that even if an employee was acting within the course and scope of employment as understood under the Workers' Compensation Act, the evidence must further show that the employer exercised actual control of the specific task to impose third party liability. In short, *Painter I* demanded a standard that required courts or a trier of fact to look at the specific task being performed and determine whether that task was subject to the employer's actual control. If so, the employee was deemed as acting in the course and scope of employment and vicarious liability could attach; if not, vicarious liability could not attach.

By confirming the application of concepts borne from workers' compensation jurisprudence, *Painter II* rejected the task-based control approach to vicarious liability when employee status is undisputed and only course and scope remained a contested issue. For imposition of liability, *Painter II* clarified that the dispositive issue simply questioned "whether the employee was performing the tasks generally assigned to him in furtherance of the employer's business" by "acting with the employer's authority and for the employer's benefit[,]" not whether the employer controlled the manner and means in which the employee performed the activity at the time of the occurrence. *Painter II*, 561 S.W.3d at 138-39.

b.

### *The Effect of Painter II on this Case*

It is fair to say that Rudolph tried this case largely in the shadow of *Painter I*. Villegas

asserted she sought recovery for injuries incurred while working for a non-subscribing employer pursuant to section 406.033 of the Texas Labor Code. In furtherance of her claim, she argued that she and Ruiz were employed by Rudolph and were working on Rudolph's premises when she sustained an injury in the course of her employment. Despite conceding the employment status of both Villegas and Ruiz, Rudolph opposed liability based on an argument that neither Ruiz nor Villegas were acting in the course and scope of their employment at the time of the incident. Rudolph relied on a task-specific, on-the-clock versus off-the-clock standard for establishing course and scope.

Rudolph argued it could not be held liable for Villegas's injuries, either directly or vicariously, because it did not control the actions of either employee at the time of the injury, as the incident occurred after the close of business while the employees were engaged in leaving the premises. Indeed, Rudolph explicitly cited to *Painter I* in its response to the plaintiff's motion for summary judgment in arguing for a control-based definition of "in the course and scope of employment" that was more stringent than how that term was traditionally defined in the workers' compensation context. But *Painter I* created a distinction in how course and scope of employment was defined that *Painter II* expressly refuted when employment status of an employee is not disputed.

Explaining the general framework of vicarious liability, *Painter II* reiterated that "liability for one person's fault may be imputed to another who is himself entirely without fault solely because of the relationship between them." *Painter II*, 561 S.W.3d at 130 (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 540 (Tex. 2002) (plurality op.)). *Painter II* described the reasoning for not applying a task-based test in the vicarious liability context as follows:

> Amerimex would have us reevaluate the worker's employment status for vicarious-liability purposes by isolating the task the worker was performing at the moment of

27

the accident and conducting an independent evaluation of the employer's control with respect to that particular task. This position is inconsistent with the framework we have described. Further, it results in an unworkable paradigm that conceivably could result in an individual shifting between employee and independent contractor status countless times in a given work day. (Internal quotations omitted).

*See Painter II*, 561 S.W.3d at 133 (citing *Mid-Continent Cas. Co. v. Andregg Contracting, Inc.*, 391 S.W.3d 573, 578 (Tex.App.—Dallas 2012, pet. denied)).

At least when it comes to the element of course and scope and whether employer liability may be imputed for injuries that occur while going to and from a workplace, the standards of direct and vicarious liability are one and the same. *Id*. at 136. We agree with the trial court that the *Painter* line of decisions had a substantial effect on the way this case was tried by wrongly pulling the focus from our long-standing jurisprudence inherent to employer-employee relationships to a task-based approach that more aptly applies to cases involving independent contractors and supervisory liability. *See Painter II*, 561 S.W.3d at 136; *see also Kroger v. Keng,* 23 S.W.3d 347, 349 (Tex. 2000) ("[Texas] Labor Code § 406.033, which is part of the Workers' Compensation Act, governs an employee's personal-injury action against his or her employer, when the employer is a nonsubscriber under the Act.").[10]

On mandamus, Rudolph retreats somewhat from direct reliance on the logic of *Painter I* and instead argues generally that the jury's determinations on course and scope of employment

---

[10] Rudolph maintains that Villegas reads too much into *Painter II* and argues that *Painter II* does not apply here because it does not deal explicitly with the access doctrine. We agree that *Painter II* does not explicitly reference the access doctrine itself. However, *Painter II* does state that the coming-and-going rule applies to both workers' compensation and vicarious liability cases. *Painter II*, 561 S.W.3d at 136. In defining a version of the rule, *Painter II* describes: "a general rule [that] an injury received while using the public streets and highways in going to or returning from the place of employment is not compensable because not incurred in the course of employment." *Id*. The coming-and-going rule is ordinarily applied to employee transit occurring on public streets and highways. *Painter II* dealt with and applied an exception to the coming-and-going rule known as the special mission exception to hold that there was a fact question on vicarious liability in the nonsubscriber context. It would follow that if the Supreme Court of Texas held in *Painter II* that the coming-and-going rule applies across both the subscriber and nonsubscriber contexts, and that one exception to the rule also applied, then logically speaking, another exception to the coming-and-going rule (the on-premises/access doctrine) could equally apply with force here. Although we find that the general principles enunciated in *Painter II* applied here, we do not otherwise decide whether there is a need for an access instruction as that issue is not now before us.

28

(including the question of whether Villegas and Ruiz's actions were done in furtherance of Rudolph's business interests) are supported by substantial evidence because: (1) Ruiz and Villegas had both clocked out and were leaving the dealership to go home when the accident occurred, (2) both were parked in front of the dealership, "which was not the sole or primary designated parking area for employees," (3) the accident occurred after Ruiz backed his truck out of the parking space and was pulling forward to leave the parking lot to go home, and (4) Villegas had been approaching her vehicle in the same parking lot but changed direction and walked into the path of Ruiz's truck just before he hit her. But, as to this detailed list of factors, *Painter II* established that the task-based on-the-clock/off-the-clock distinction cited as item 1 is not dispositive and largely an artificial distinction that unnecessarily subjects a nonsubscriber case to double scrutiny on the issue of control. Here, it is undisputed that both Villegas and Ruiz were employees subject to Rudolph's general authority by virtue of their employment status. Moreover, items 2, 3, and 4 simply confirm that the incident occurred on the premises, not on a public street or highway.

c.

**No Fact Issues**

Applying the on-premises/access doctrine to this case, we conclude that the trial court's determination that it needed to reconsider whether Villegas and Ruiz were acting in the course and scope of employment as a matter of law was a plausible consequence of *Painter II's* issuance on the day of the verdict. Undoubtedly, such reconsideration would impact the characterization of Villegas's claim as a negligence suit brought pursuant to section 406.033 of the Texas Labor Code. But even still, as a third-party claim based on vicarious liability, the course-and scope analysis applied to Ruiz would not include a task-based analysis. The change from a fact-intensive, task-based approach to a premises-based approach represents a significant shift in a major assumption

29

that permeated this entire trial.

As such, the trial court's determination that it would have conducted the trial differently is reasonable under the circumstances as shown by the mandamus record. With respect to the motion for summary judgment specifically, we find it to be plausible that the trial court would reconsider the denial of summary judgment on the course and scope issue had it had the benefit of *Painter II*. All that is required to establish course and scope under the on-premises rule, and its extension into the access doctrine, is a showing that an employer has evinced an intention that a particular area of premises or access route can be used by the employee in going to and from work and the area or access route is so closely related to the employer's premises as to be fairly treated as part of the premises. *See Tex. Comp. Ins. Co. v. Matthews*, 519 S.W.2d 630, 631 (Tex. 1974); *see also Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404-05 (Tex. 2009) ("An employer ordinarily will not be liable for torts committed by off-duty employees except when the torts were committed on the employer's premises or with the employer's chattels.").

It is undisputed that Villegas and Ruiz were employees of Rudolph at the time of the incident. It is also undisputed that Villegas was injured while on Rudolph's premises, not on a public street or highway. We conclude that the trial court's reasoning is sound on the merits, and as a court reviewing this matter for abuse of discretion from a cold record, we must give the trial judge, who sat through the trial in its entirety and who presumably would not elect to redo it over again but for an adequate reason, some berth and leeway in this mandamus posture.

d.

### *Harmful Error Analysis*

Rudolph argues that even if the access doctrine should have applied in this case, Villegas cannot obtain a new trial under these circumstances because the trial court granted a charge that

30

she requested which instructed the jury on this doctrine. Specifically, Question 1, which asked the jury if Flores, Villegas, and Ruiz were acting in the course and scope of their employment at the time of the accident, contained an instruction stating:

> An injury occurring while the employee is traveling to or from work is in the course of employment only if the employee is injured at a place where the employer has evidenced an intention that a particular route or area be used by the employee in going to or from work and where the route or area is owned by the employer or is so closely related to the employer's premises as to be fairly treated as a part of the employer's premises.

The jury found that Flores was acting in the course and scope of employment, but that Villegas and Ruiz were not. Rudolph takes this answer as conclusive evidence that the jury considered this issue and declined to find that Villegas was acting in the course and scope of employment. In other words, all other factors aside, Rudolph argues the jury was directed to answer the course and scope question having received an instruction about the premises/access doctrine.

While Rudolph is correct that the jury received such instruction, the problem with this argument is that it wholly ignores Villegas's argument on summary judgment and reframes the matter into questions of charge error and legal insufficiency. But here, we are not tasked with determining whether the jury was correctly instructed or whether the evidence supported the verdict. Rather, we must determine on mandamus review whether the trial court's stated reason provides a legally sound rationale that is based on the record. *See In re Toyota*, 407 S.W.3d at 749. Based on *Painter II* and other authorities cited by Plaintiffs' motion for judgment notwithstanding the verdict, the trial court stated that it needed to reconsider whether Villegas was acting in the course and scope of her employment as a matter of law. The implication attributed to *Painter II* makes sense, as the clarification from the Supreme Court of Texas shifted the focus of inquiry from whether Villegas and Ruiz were "on the clock" or "off the clock" at the time of the incident (i.e. whether their individual activities at the time of the incident were subject to Rudolph's task-

31

by-task control under *Painter I*) or whether the incident occurred on Rudolph's premises.

Rudolph, in its mandamus petition, does not argue that there is a fact issue that would preclude summary judgment and create a triable issue *under an on-premises/access doctrine* framework. It argues only that any error in trying the case was harmless because the jury charge was substantially correct as to its inclusion of the doctrine. But that reasoning only applies if there are relevant fact issues for the jury to decide. Because we find that the trial court stated a legally plausible explanation for its ruling on *Painter II* grounds, and because Rudolph did not refute the proposition that there were no material fact questions for determination under the access/premises doctrine that Villegas was injured on premises belonging to Rudolph, the grant of a new trial on this ground is not a clear abuse of the trial court's discretion.

We find that this ground, either standing alone or taken in concert with others, is sufficient to support the grant of a new trial.

Accordingly, we overrule Issue Three.

## C.

### The Expert Testimony

In Issue Four, the third sub-issue, Rudolph contends that the trial court abused its discretion by granting a new trial based on expert testimony, which it also contends, the jury unequivocally stated it could disregard pursuant to the trial court's limiting instructions. In its order, the trial court stated that defense expert Gary Wimbish "intentionally injected unreliable double hearsay, non-responsive to the question asked him in an attempt to inject an improper inference before the jury." The court further stated, "[t]hough the Court did admonish the witness as well as instruct the jury to try to eliminate the harm, it is obvious to this Court that the harm done could not be eliminated or removed." Based on its observation, the trial court concluded that "this improper evidence and

32

behavior to impugn the character of Irma Vanessa Villegas did cause the rendition of an incorrect verdict by the Jury as the evidence showed Irma Vanessa Villegas was a hardworking dependable and responsible mother, grandmother and sister; there was no negative evidence or detracting evidence other than expert Wimbish's testimony." We agree that the record establishes that this basis constituted a valid ground on which to grant a new trial such that Rudolph failed to show a clear abuse of discretion.

1.

As with the other grounds, Rudolph attacks this ground as being facially invalid and vague. In arguing that the effect of Dr. Wimbish's testimony cannot be firmly established, Rudolph rhetorically asks whether this improper testimony led the jury to find Villegas to be partially negligent, whether it led the jury to assign her a higher percentage, or whether it had an effect on damages. Rudolph concludes that because the trial court's order does not specify which of those options are at play, the order for new trial is facially invalid.

Again, we reiterate that a trial court has a duty to "explain how the evidence (or lack of evidence) undermines the jury's findings." *United Scaffolding*, 377 S.W.3d at 689. On this ground, the trial court articulates that it granted a new trial because Dr. Wimbish's testimony "injected unreliable double hearsay, non-responsive to the question asked him in an attempt to inject an improper inference before the jury" and the harm from those comments "could not be eliminated or removed" by the trial court's instructions. In order words, the trial court articulated that it found that Dr. Wimbish made improper, potentially inflammatory comments in violation of the Rules of Evidence that prejudiced the jury against Villegas. We conclude that this reasoning is specific enough to meet the standard for facial sufficiency.

33

2.

Having determined that the trial court's order on this ground meets the facial requirements, we next assess the stated ground on its merits but within the prism of a mandamus review. We review the trial court's admission or exclusion of evidence for abuse of discretion. *Hernandez v. Moss*, 538 S.W.3d 160, 167 (Tex.App.—El Paso 2017, no pet.). A trial court abuses its discretion on evidentiary issues if it acts arbitrarily or unreasonably, or without reference to guiding principles or rules. *Id*. A trial court's erroneous decision to admit or exclude evidence is not reversible unless the error probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a).

Dr. Wimbish, a board-certified forensic toxicologist with more than 40-years' experience, was called to testify regarding Villegas's and Ruiz's respective blood-alcohol content, whether alcohol affected Ruiz on the night of the accident, and if so, to what extent. Dr. Wimbish testified that Ruiz had a BAC of .02 and Villegas had a BAC of .04, both under the legal limit of .08. During cross-examination by plaintiff's counsel, Dr. Wimbish made comments relaying information he had gleaned from the deposition of another worker at Rudolph—testimony that was otherwise not admitted at trial—suggesting that Villegas had an alcohol problem:

> Q. . . . You've been telling the jury about naive drinkers and nonnaive drinkers and what you eat and all that stuff. You've been telling us all about that, but I'm talking about the black-and-white language on the chart that you provided. So on the chart that you provided it shows impairment listed as a clinical sign and symptom between .01 and .05. Correct?
>
> A. That's correct. But if we believe in those charts, we wouldn't need toxicologists or the police officers.
>
> Q. Okay. Now, in terms of Ms. Villegas, you listed her as a .04. So according to your listing, I guess she'd fall in both categories?
>
> A. She could fall in either one.

. . .

Q. The alcohol she consumed was consumed on the premises of Rudolph Mazda?

A. And that's the only information I have.

Q. And the information that you have includes that the alcohol was allowed by Rudolph's head person in charge on that night?

A. My information is a bit different from that.

Q. What information do you have that's different from that?

A. Well, in the information that I have received, she brings alcohol with her to work, and --

Q. Who?

A. -- and it's the information that I have -- and had been drinking out of her cup on her own supply of alcohol that day.

Q. So you are taking the testimony of Lisa Melbourne who said -- is that where you're getting that from?

A. I don't remember the exact person, but that information was available to me. And then there's clinical information -- and I'm not being derogatory. I'm just trying to say this is information that I considered. Okay? She verified in her statement she may have a problem with alcohol because having to wake up in the middle of the night and drink alcohol so she can go back to sleep.

Q. Okay, sir. I'm not --

[Plaintiffs' attorney]: Yeah. Can we approach actually?

Following a discussion at the bench, Villegas moved for a mistrial. The record shows the trial judge commented on the "disturbing" testimony injected by Wimbish at the very end of trial, and he debated granting a mistrial in full, but ultimately found that the comment came as the result of a broadly worded question and decided to admonish the jury to disregard the comments. The trial court's decision to deny a mistrial and grant a new trial came after the jury's verdict was received.

35

Villegas argues that the trial court could have correctly granted the new trial based on Dr. Wimbish's testimony because he was cloaked in the aura and authority of an expert in the eyes of a jury. Rudolph argues that even if Dr. Wimbish's testimony was error, it was harmless, since there was adequate testimony to support the jury's comparative negligence finding against Villegas. As support, Rudolph argues that Ruiz testified that immediately before the accident that he saw Villegas appear in front of his truck with her hands in the air and saying his name. Rudolph also pointed out that the evidence showed that Villegas had findings of a .04 BAC and may have stepped in front of Ruiz's truck. Rudolph points out that an instruction to disregard testimony is generally presumed to cure any error. *See Lee v. State*, 779 S.W.2d 913, 916 (Tex.App.—Houston [1st Dist.] 1989, pet. ref'd) ("An instruction to disregard cures any error unless the evidence is clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing its impression on the jury."). Rudolph also downplays Dr. Wimbish's importance as a witness, saying his testimony was "obscure" especially when considering the many witnesses that the Plaintiffs called to testify about Villegas's condition and her relationship with Juarez.

Again, to obtain mandamus relief from the new trial order, Rudolph bears the burden of showing that the trial court clearly abused its discretion. Villegas has offered a plausible explanation for the trial court's decision—namely, the weight an expert witness's opinion would carry on the jury, particularly when the expert revealed information that had been subject to a motion in limine. Rudolph has not shown that the trial court's decision to grant a new trial based on Dr. Wimbish's comments constituted a clear abuse of discretion for which mandamus must issue. As such, mandamus relief is improper as to this ground. This ground may justify the grant of a new trial in its entirety either individually or standing in concert with another ground.

Accordingly, we overrule Issue Four.

**D.**

**Line-Item Awards of Zero Damages**

Because each of the foregoing grounds, standing alone or collectively, would justify the grant of a new trial in its entirety, we decline to address Rudolph's remaining two sub-issues which challenge the grant of new trial based on the jury's award of zero damages on several line items of damages, which, if meritorious, would result in a new trial grant as to damages only. We conclude in this instance that resolution of the remaining sub-issues is unnecessary to the disposition of this appeal. *See* TEX. R. APP. P. 47.1.

Accordingly, we overrule Issue One, the overarching issue, as well as Issues Five and Six, the two remaining issues on damages.

**CONCLUSION**

As provided above, there are several grounds, individually and collectively, that would support the trial court's new trial order in its entirety. Because no clear abuse of discretion has been demonstrated, we conclude that the order granting a new trial is not subject to mandamus correction by this Court. Rudolph's petition for a writ of mandamus is denied.

GINA M. PALAFOX, Justice

December 30, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.
Alley, C.J., dissenting

37